FILED IN CLERK'S OFFICE
U S D C   Atlanta

OCT 2 3 2006

JAMES N. HATTEN, Clerk
By
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| RICHARD V. HARRISON,<br>**Plaintiff,**<br><br>vs.<br><br>INTERNATIONAL BUSINESS<br>MACHINES (IBM); STEPHANIE<br>PARKE, Systems Director of Finance;<br>ANDY VODOPIA, CFO; DEBORAH<br>BURACK, Human Resources Partner;<br>HARRY GORNICK, ASR Manager;<br>BETTY JOHNSON, Case Manager<br>Nurse,<br>**Defendants.** | } <br>} <br>} **CIVIL ACTION**<br>} **FILE NO. _____**<br>} <br>} **1:06-CV-2549**<br>} <br>} <br>} **JEC**<br>} <br>} <br>} <br>} <br>} <br>} <br>} <br>} |

## COMPLAINT

COMES NOW, Richard. V. Harrison, and files this Complaint against Defendants, and shows the following:

## JURISDICTION

### 1.

This action is brought pursuant Section 701(b) of the Civil Rights Act of 1964; 42 U.S.C. § 2000 et seq., as amended in 1991, 42 U.S.C. § 1981A (Title VII), and 28 U.S.C. §§1331, 1343, and 1367.

2.

The Court has jurisdiction over claims brought under state law in that these claims arise under the same nucleus of operative facts which form the basis of the Federal claims and are pendent thereto.

## VENUE

3.

A substantial part of the events or omissions giving rise to the claim in this matter occurred in this judicial district in Atlanta, Georgia, one or more defendants are located in this judicial district, and venue is thus proper in the Atlanta Division of the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C §1391.

## PARTIES

4.

Plaintiff, Richard V. Harrison, is a Jamaican-Black male, who at all times relevant hereto was an employee at IBM.

5.

At all times relevant to this Complaint, Defendant Stephanie Parke, Caucasian female, was employed by IBM as Director of Systems Finance. Ms. Parke may be served as provided by law.

2

6.

At all times relevant to this Complaint, Defendant, Andy Vodopia, Caucasian male, was employed by IBM as the Chief Financial Officer for Open Infrastructure Offerings.  Mr. Vodopia may be served as provided by law.

7.

At all times relevant to this Complaint, Defendant, Deborah Burack, Caucasian female, was employed by IBM as Human Resources Partner.  Ms. Burack may be served as provided by law.

8.

At all times relevant to this Complaint, Defendant, Harry Gornick, Caucasian male, was employed by IBM as Manager of Accounts Service Representative.  Mr. Gornick may be served as provided by law.

9.

At all times relevant to this Complaint, Defendant; Betty Johnson, Caucasian female was employed by IBM as Case Manager Nurse.  Ms. Johnson may be served as provided by law.

10.

IBM is a New York Corporation, authorized to do business in Georgia and may be served via its authorized agent for service of process, C T Corporation, 1201 Peachtree Street, NE, Atlanta, Georgia  30361.

## CONDITIONS PRECEDENT TO SUIT

11.

Plaintiff timely filed a charge of racial discrimination with the EEOC, designated as Charge Nos. 410-2006-01197 and 110-2006-00501, and timely filed this Complaint after issuance of a Right to Sue letter from the EEOC, which is attached hereto.

## FACTUAL ALLEGATIONS

12.

Plaintiff was hired by IBM on June 9, 1997, as a Professional Accountant.

13.

In September 2000, Plaintiff was promoted to the position of Financial Analyst.

14.

In November 2004, Plaintiff worked in the division of IBM Global Services -- Strategic Outsourcing, as a Financial Analyst.

15.

Plaintiff provided financial analyst support for strategic outsourcing commercial accounts.

16.

At this time, Donna Pressnall was Plaintiff's manager.

17.

During this period, Ms. Pressnall asked Plaintiff to attest to or sign an attestation letter concerning the financial accuracy of certain strategic outsourcing commercial accounts.

18.

Plaintiff declined to attest to the financial accuracy of the accounts for various reasons:

a.      Plaintiff did not have full disclosure of the financial accuracy;

b.      Plaintiff was not legally required to make such an attestation, and

c.      Not all Financial Analysts were attesting to the accounts.

19.

Consequently, on or about January 20, 2005, Ms. Pressnall gave Plaintiff a job performance rating of 2.

20.

Plaintiff should have received a 2+ rating.

21.

In addition, in January 2005, Ms. Pressnall and her superior, Stacie Herman, put negative and disparaging comments in Plaintiff's personnel file, that were false.

5

22.

Ms. Herman's superior, Rosemary Reutter, directed Ms. Pressnall to remove the negative and disparaging remarks from Plaintiff's record.

23.

However, Ms. Reutter did not direct Ms. Pressnall to change the 2 rating.

24.

Plaintiff believed Ms. Pressnall and Ms. Herman's negative treatment of him was of a harassing nature and in retaliation of him not attesting to or signing an attestation letter concerning the financial accuracy of the commercial accounts.

25.

Consequently, Plaintiff began searching for another position within the IBM organization.

26.

In 2003 Paul Hendricks, black male, left the employment of IBM.

27.

Mr. Hendricks was employed as the Director of Open Infrastructure Offering (OIO).[1]

---

[1]Open Infrastructure Offerings (OIO) is an IBM organization where customers are offered huge discounts on "bundled" deals, based on their long-term commitment to purchase hardware, services, etc., over an extended period of time.

28.

Consequently, in 2003, Steve Odom, Caucasian male, replaced Mr. Hendricks as the new OIO Director.

29.

Around the same time, IBM repositioned Defendant, Andy Vodopia, Caucasian male, to the position of Chief Finance Officer (CFO).

30.

Prior to his repositioning, Mr. Vodopia had been employed with IBM for approximately 228 years.

31.

In addition, Judson Ficklen, Caucasian male, was repositioned as the Business Unit Executive (BUE).

32.

Mr. Vodopia, Mr. Odom and Mr. Ficklen were placed in their respective positions to fix, reportedly, the "control problems" Mr. Hendricks could not fix.[2]

33.

On or around 2003 or 2004, Mr. Vodopia hired Brian Fleck and Jay Moore, Caucasian males, as OIO Financial Analyst.

---

[2]The "control problems" refer to the problems that were identified in the 2003 audit, which will be identified and discussed later in the instant Complaint.

34.

Mr. Fleck and Mr. Moore worked for Mr. Vodopia six (6) months each and quit, reportedly, because they could not handle the "control problems" that existed in OIO.

35.

Mr. Fleck and Mr. Moore, reportedly, could not deal with Mr. Vodopia.

36.

On February 4, 2005, Mr. Vodopia interviewed Plaintiff for the OIO Financial Analyst position, specifically, to work on the Bank of America (BOA) Account.[3]

37.

On February 10, 2005, Plaintiff informed Mr. Vodopia he would accept the position.

38.

This was the first time Plaintiff held the Financial Analyst position in OIO and worked on the BOA Account.

---

[3]The BOA Account was obtained by IBM in December 2004.

39.

The Aggregation Pricing model for the BOA Account was not ready, even though it was required in order for Plaintiff to efficiently work on the BOA Account.[4]

40.

On February 15, 2005, Plaintiff started physically working for Mr. Vodopia, although Plaintiff's formal hire date was February 16, 2005.

41.

Around the same time, Mr. Vodopia hired Maryn Schwebel, Caucasian female, as an OIO Financial Analyst.

42.

At the time of her hire, Ms. Schwebel worked mobile from New York.

43.

Ms. Schwebel was hired as the Department Head and Plaintiff's team leader.

44.

Immediately, Mr. Vodopia began to make demands of Plaintiff of a disparaging nature.

---

[4]The Aggregation Pricing Model is a pricing tool that serves as the Plan of Record (POR) and ties into both the Account Service Representative model (ASR) and IBM Global Financing Pricing Tool (IGF). The function of the ASR is to manage a contract in terms of invoicing, reconciliation, and tracking of orders, letters, etc.   The IGF pricing model is the plan of record for IGF

45.

For example, Mr. Vodopia instructed Plaintiff to leave his blinds and door opens.

46.

Mr. Vodopia required that Plaintiff log in a message of his whereabouts, on Sametime, each time he left his desk.[5]

47.

During his 9 years of employment with IBM, Defendant had never required that Plaintiffs log in a message each time he left his desk.

48.

Mr. Vodopia did not require that Ms. Schwebel keep her door and blinds open.

49.

Nor did Mr. Vodopia require that Ms. Schwebel log in a message of her whereabouts, on Sametime, each time she left her desk.

50.

Mr. Vodopia did not allow Plaintiff to write his Personal Business Commitment (PBC) goals for 2005.[6]

---

[5]Sametime is IBM's instant messaging tool that allows one to see if another is logged onto their computer.

51.

Instead, Mr. Vodopia wrote Plaintiff's 2005 goals for him and submitted them to Plaintiff.

52.

On April 12, 2005, Mr. Vodopia wrote Plaintiff's 2005 goals to correspond to the "control problems" that were identified from the audits during Mr. Hendrick's tenure.

53.

It is Plaintiff's belief that Mr. Vodopia tailored his (Plaintiff's) goals to the "control problems" identified in the 2003 audit because he knew Plaintiff could not reasonably attain the goals.

54.

Plaintiff further believes Mr. Vodopia tailored the goals to make him (Plaintiff) the scapegoat for the ongoing-unattainable "control problems" with OIO transactions.

55.

On or about March 25, 2005, Plaintiff contacted Defendant, Debbie Burack, HR Partner, and notified her that Mr. Vodopia was mistreating and harassing him.

---

[6]At the beginning of each year, each employee is required to write his PBC goals  At the beginning of the following year, the employee is required to write his attainment of the goals that he set in his PBC.

56.

On or about March 25, 2005, Plaintiff requested a separation package due to Mr. Vodopia's disparaging treatment and harassment.

57.

Ms. Burack advised Plaintiff, via voicemail, that he had to talk to Mr. Vodopia's supervisor, Defendant, Stephanie Parke.

58.

On or about March 25, 2005, Ms. Burack informed Plaintiff that IBM could not offer him a separation package.

59.

On March 27, 2005, Plaintiff called Ms. Parke, during which Plaintiff discussed Mr. Vodopia's harassment and disparaging treatment of him.

60.

After Plaintiff and Ms. Parke talked for 3 hours, she informed Plaintiff that she would get back to him concerning his complaints.

61.

Ms. Parke never got back with Plaintiff concerning his complaints.

62.

On March 28, 2005, Mr. Vodopia called client into his office, obviously agitated, and told Plaintiff that that was the first time he was ever "escalated to his superior."

63.

During their discussion, Mr. Vodopia expressed the following to Plaintiff:

a.      That Plaintiff's previous manager was right, that Plaintiff was high maintenance;

b.      That Plaintiff would never get another position within IBM;

c.      Told Plaintiff to go back to his former manager, Donna Pressnall;

d.      Told Plaintiff he is free to look at another job in IBM;

e.      That Plaintiff could not leave until he (Vodopia) found a replacement.

64.

Pursuant to IBM's policy, Mr. Vodopia was required to post Plaintiff's position.

65.

Mr. Vodopia did not post Plaintiff's job and Plaintiff was forced to continue to work under Mr. Vodopia's harsh treatment.

66.

On April 27, 2005, during a workshop, Mr. Vodopia told IOI project executives that Plaintiff is "all yours."

67.

Consequently, the OIO project executives began delegating work to Plaintiff.

68.

Because of the Defendants' actions, Plaintiff began developing the following medical problems sometime in May 2005:

a.      Insomnia and

b.      Anxiety attacks.

69.

On May 2, 2005, Mr. Vodopia assigned an additional account to Plaintiff, UPMC (352M TCV).

70.

The UPMC Account was the second largest account in OIO.

71.

BOA was the largest Account in OIO.

72.

On May 17, 2005, Plaintiff expressed interest to Defendant, Mr. Gornick, about working in his department as an ASR.

73.

In the meanwhile, on May 19, 2005, Plaintiff emailed Ms. Parke to report that Mr. Vodopia's harassment and hostility towards him escalated and was retaliatory in nature.

74.

Among the complaints Plaintiff lodged are the following:

a.   Mr. Vodopia required that Plaintiff keep his door and blinds open, but did not require that his co-workers do the same;

b.   Mr. Vodopia required that Plaintiff log the number of times he met with customers, but did not require that his co-workers do the same;

c.   Mr. Vodopia permitted Plaintiff's co-workers to work from home and mobile, but denied him the same flexibility;

d.   Mr. Vodopia assigned Plaintiff the responsibility of fixing the "control problems" with OIO maintenance, with knowledge that it was his and the management team's responsibility to solution the problems.

75.

As a result of Plaintiff's complaints identified above, Ms. Parke initiated an open door investigation.[7]

76.

The complainant has the right to request which investigative process he wishes to be utilized.

77.

Ms. Parke failed to give Plaintiff a choice and chose the "open door investigation" on her own.

78.

The "open door investigation" does not allow for the employee to rebut the findings.

79.

The open door investigation Ms. Parke began lasted from June 2005 to September 2005.

80.

The process normally takes 30 to 60 days.

---

[7]IBM had three avenues through which a complainant could lodge a grievance; the "open door investigation", "panel review process" and "speak up." In this instance, Ms. Parke initiated the open door process.

81.

Department of Human Resources assigned Plaintiff's complaint to Perry Rhue, Black male Manager within IBM.Com, who conducted an investigation.

82.

During his investigation, Mr. Rhue took Mr. Vodopia's responses to Plaintiff's complaints and submitted them to HR.

83.

Mr. Rhue, at the direction of HR, did not permit Plaintiff to review Mr. Vodopia's responses before he reached his conclusion.

84.

Because Plaintiff's medical conditions continued, he began treatment with Dr. Miriam George on June 15, 2005.

85.

As a result, Dr. George put Plaintiff on a 3 day sick leave.

86.

At the end of the open door investigation in September 2005, Mr. Vodopia started lashing out at Plaintiff, by dumping the following OIO contracts on him, with foreknowledge they were troubled accounts:

a.    Automatic Data Processing, Inc. (ADP);

b.    Bank of America Extension Negotiations;

c.    IGS Audit.

87.

On June 10, 2005, while Mr. Rhue was investigating Plaintiff's complaint Mr. Gornick posted one (1) ASR position.

88.

The preference of the ASR in the posting was stated as follows: "*Although the position can be located anywhere, the preference for this location is Atlanta or Dallas.*"

89.

Consequently, on June 14, 2005, Mr. Gornick informed Plaintiff, through instant message, that he needed to apply for the position by June 23, 2005.

90.

Plaintiff applied for the position on June 23, 2005.

91.

On June 23, 2005, IBM removed the ASR position from the posting.

92.

On June 24, 2005, an IBM employee, Steven Harper, informed Plaintiff that Norbert Cardenas, Caucasian Hispanic, was hired for the ASR position.

93.

Shortly thereafter, on June 27, 2005, IBM conducted an audit of OIO organization.

94.

The audit lasted through July 27, 2005.

95.

The audit was a follow-up to the October 2003 audit that was conducted during Mr. Hendrick's tenure.

96.

The 2005 audit was passed.

97.

However, the 2005 results did not reflect the true posture of the OIO "control problems" and, in actually, should not have passed.

98.

Plaintiff was excluded from the 2005 audit meetings.

99.

However, Ms. Schwebel was invited to and attended every audit meeting.

100.

In fact, Mr. Vodopia customarily treated Ms. Schwebel more favorably in comparison to his treatment of Plaintiff.

101.

For example, Mr. Vodopia excluded Plaintiff from meetings concerning the BOA Account during the 2005 audit, although he invited Ms. Schwebel to the meetings.

102.

In addition, Mr. Vodopia provided training for Ms. Schwebel on new web application, but did not train or provide training to Plaintiff.

103.

Although Mr. Gornick had already filled the ASR position, he interviewed Plaintiff for the position on July 28, 2005, one day after the conclusion of the 2005 audit.

104.

Thereafter, on August 16, 2005, Mr. Gornick informed Plaintiff that he received 86 applications for the ASR position and that Plaintiff was one of six (6) candidates chosen to be interviewed.

105.

Mr. Gornick further confirmed that he had filled the position with a Caucasian-Hispanic, male.

106.

At the same time, Mr. Gornick informed Plaintiff he filled two (2) additional

positions with two (2) Caucasian females, Nancy Reno and Roberta Coughlin.

107.

At that juncture, Plaintiff complained to Mr. Gornick that he was not made

aware that the 2 additional positions existed.

108.

Plaintiff further complained to Mr. Gornick that the 2 additional positions

were never posted prior to the time he complained on August 16, 2005.

109.

Thereafter, on August 19, 2005, Mr. Gornick reposted the ASR position that

was filled by Mr. Cardenas and, for the first time, posted the two additional

positions.[8]

110.

At this time, Mr. Gornick and HR changed the job preference of the ASR

position as follows:

a.       **From** *"Although the position can be located anywhere, the preference*

*for this location is Atlanta or Dallas"* **To** *Although the position can be located*

_____

[8] The three (3) ASR positions as described above consisted of one posting, with the same
reference number.

*anywhere, the preference for this location is Atlanta or Dallas, Prefer candidate with Customer Fulfillment (Customer Support Operations) with experience with emphasis on accounts receivable.)*

    b.      The *# of positions opened"* from *1* to *3,* and

    c.      The *"Apply by Date"* changed from **6/23/05 to 9/16/05;**

### 111.

On August 23, 2005, in welcoming Ms. Reno and Ms. Coughlin to the 2 additional positions, Mr. Gornick used the very verbiage that he used in the altered posting on August 19, 2005.

### 112.

On September 19, 2005, Mr. Rhue reviewed his findings of the open door investigation, with Plaintiff, via telephone conference.[9]

### 113.

On the same day, Plaintiff asked for a summary of the investigation conducted by Mr. Rhue.

### 114.

On September 27, 2005, Gabriel Graciosi, Vice President of HR, mailed Plaintiff, in a separate package, his concurrence of Mr. Rhue's findings.

---

[9]After the assigned investigator completes their investigation, it is reviewed by a Senior Executive. The Senior Executive concurs or dissents to the investigator's findings, which completes the investigative process

115.

On September 28, 2005, Plaintiff received a summary of Mr. Rhue's investigation.

116.

The results of the open door investigation weighed in favor of Defendants and did not adequately represent the truth.

117.

Because of Defendants' actions or inactions, Plaintiff's medical condition exacerbated and he sought further treatment with Dr. George on November 8, 2005.

118.

As a result, Dr. George recommended Plaintiff take a short term disability for two (2) weeks.

119.

Plaintiff went on short term disability from November 8, 2005 to November 27, 2005.

120.

On November 8, 2005, after his visit with Dr. George, Plaintiff filed EEOC Discrimination Charges against Defendants.

121.

IBM previously instructed Plaintiff that if he had to stay out beyond November 28, 2005, he would need to see a specialist or psychiatrist.

122.

Plaintiff realizing that he would need additional time to address his medical and psychological issues, conferred with a psychiatrist, Dr. R. Ahmad.

123.

Based on Dr. Ahmad's evaluation of Plaintiff, she recommended that IBM continue Plaintiff's short term disability from November 28, 2005 to February 27, 2006.

124.

Because Plaintiff's medical and psychological position had not improved, Dr. Ahmad, again, recommended Plaintiff's short term disability be extended.

125.

Plaintiff's disability was extended, again, from January 14, 2006 to February 26, 2006.

126.

Because the distance from Plaintiff's home and Dr. Ahmad's office created a hardship, Plaintiff conferred with Dr. Edward Ajayi, whose office was closer to Plaintiff's home.

127.

Upon Plaintiff's second visit with Dr. Ajayi, he concluded that Plaintiff's condition had not improved.

128.

Consequently, Dr. Ajayi recommended that Plaintiff's short term disability be extended from February 27, 2006 to March 26, 2006.

129.

On February 28, 2006, Mr. Vodopia met with Wendy Wang, IBM's staff attorney and Michelle Ames, HR Partner, to discuss backfilling of Plaintiff's position, while he was on short term disability.

130.

Consequently, on March 6, 2006, Mr. Vodopia interviewed Jeffrey Baldwin, Caucasian male for Plaintiff's position.

131.

At this time, Mr. Baldwin was a supplemental non-regular employee with IBM and was not able to fill Plaintiff's position, because he had not graduated from college.[10]

---

[10] The company's complementary or supplemental non-regular workforce includes various workers hired under temporary, part-time and limited-term employment arrangements.

132.

On March, 7, 2006, Mr. Vodopia posted client's position and stipulated that the applicant need to apply by June 1, 2006.

133.

During Plaintiff's short term disability, Mr. Vodopia voluntarily sent Plaintiff job announcements from IBM and advised him to pursue them.

134.

On March 22, 2006, Plaintiff informed Mr. Vodopia that he would likely return to work on March 27, 2006.

135.

Beginning March 22, 2006, through March 23, 2006, MetLife bombarded Plaintiff with calls from, at least, five different customer service representatives, regarding Plaintiff's disability.

136.

MetLife manages IBM's long term disability program.

137.

On March 23, 2006, Dr. Ajayi gave Plaintiff the green light to return to work on March 27, 2006.

138.

On March 24, 2006, Dr. Ajayi faxed the Medical Treatment Report (MTR) and Psychiatric Impairment Report (PIR) to Defendant, Betty Johnson, Case Manager, IBM Global Well-being and Health Services.[11]

139.

As a condition to his return, Dr. Ajayi recommended that Plaintiff work from home, when possible.

140.

IBM rejected Dr. Ajayi's recommendation.

141.

Upon his return to work on March 27, 2006, Plaintiff's position had not been filled.

142.

After Plaintiff returned on March 27, 2006, Mr. Vodopia's hostility towards him escalated.

143.

As a result, Mr. Vodopia began to retaliate against Plaintiff as follows:

a.     Mr. Vodopia moved Plaintiff out of his assigned office;

---

[11] The MTR summarizes the doctor's diagnosis, treatment and recommendation   The PIR analyzes the patient's psychological well-being.

b.      Put Plaintiff in a dark room where the ports were not working;

c.      Removed Plaintiff from the BOA Account;

d.      Assigned Plaintiff mundane tasks, such as manually inputting cells and printing order letters, a task that student workers usually perform.

e.      Assigned Plaintiff unattainable goals, i.e., obtain IGF pricing models with knowledge that they were inoperative.

144.

During a conversation with Mr. Vodopia on March 27, 2006, Plaintiff asked Mr. Vodopia when he would get an opportunity to complete his attainment for his 2005 PBC goals.

145.

Mr. Vodopia informed Plaintiff that he would give him until March 28, 2006 to submit his PBC attainment results.

146.

On March 29, 2006, Plaintiff submitted his attainment for the 2005 PBC goals.

147.

On the same day, Mr. Vodopia announced, in the presence of Tasha Galloway, Black female, that Mr. Baldwin was not accepting Plaintiff's Financial Analyst position.

148.

Ms. Galloway started working for Mr. Vodopia as a Financial Analyst in January 2006.

149.

On October 31, 2005, Mr. Vododpia had approached Ms. Galloway and asked her if she would work for him.

150.

Ms. Galloway had previously worked for Mr. Vodopia.

151.

Ms. Galloway thought it was odd that Mr. Vodopia would ask her to work for him because she was aware that her work performance did not meet the job requirement.

152.

As well, Mr. Vodopia was aware that Ms. Galloway's work performance did not meet the job requirement.

153.

Nevertheless, Ms. Galloway accepted the offer.

154.

However, on March 6, 2006, when Mr. Vodopia interviewed Mr. Baldwin, he failed to introduce him to Ms. Gallaway.

155.

In fact, Mr. Vodopia failed to inform Plaintiff that he would interview Mr. Baldwin for his position.

156.

On March 30, 2006, Plaintiff had a conference with Ms. Parke and again, complained about the on-going harassment and retaliation by Mr. Vodopia.

157.

Ms. Parke told Plaintiff to work from home until further notice.

158.

On March 31, 2006, Ms. Parke called Plaintiff and informed him that she handed his concerns over to HR and someone from HR would call him.

159.

On the same day Ms. Johnson and an IBM doctor, unknown to Plaintiff, contacted Dr. Ajayi.

160.

The unidentified doctor advised Dr. Ajayi to re-evaulate Plaintiff, based on complaints from several managers that Plaintiff exhibited hostile behavior.

161.

Ms. Burack and HR failed to respond to and address Plaintiff's previous Complaints.

30

162.

On April 3, 2006, Plaintiff filed Retaliation Charges with EEOC.

163.

On April 18, 2006, Ms. Parke sent Mr. Vodopia a note instructing him to schedule Plaintiff's 2005 PBC meeting.

164.

On the same day, Mr. Vodopia scheduled PBC meeting for April 21, 2006.

165.

On April 20, 2006, Mr. Vodopia cancelled the April 21st meeting.

166.

Mr. Vodopia subsequently re-scheduled the meeting for May 4, 2006.

167.

On May 4, 2006, Mr. Vodopia reviewed Plaintiff's PBC results with him.

168.

Ms. Parke was present at the review.

169.

On the same day, Mr. Vodopia gave Plaintiff a rating of 3.[12]

---

[12] The manager reviews the employee's attainment goals and gives a rating. The manager gives to the employee for feedback and a rebuttal. The rating and feedback goes to the immediate manager's superior. The superior signs off on the manager's rating.

170.

Plaintiff should have received at least a 2+.

171.

Again, on the same day, Plaintiff made a written rebuttal and stated the evaluation was written to make him a scapegoat.

172.

On or about May 5, 2006, Mr. Vodopia sent the rating and feedback to his superior, Ms. Parke as final reviewer.

173.

On May 18, 2006, Ms. Parke signed off on Mr. Vodopia's rating, affirming Mr. Vodopia's findings.

174.

Plaintiff received a low rating, despite the fact his previous assessments were excellent.

175.

In addition, between May 2005 and August 2005, Plaintiff received numerous written accolades from customers, who expressed their appreciation for his hard work on the BOA contract.

176.

It took Ms. Parke two (2) weeks to complete her review.[13]

177.

Mr. Vodopia continued to harass and retaliate against Plaintiff after his rebuttal.

178.

Mr. Vodopia's harassment and retaliation continues to date.

## (INTERNATIONAL BUSINESS MACHINES)

### COUNT I
### Race and National Origin Discrimination

179.

Plaintiff incorporates the allegations contained in paragraphs 1 through 178, as if specifically plead herein.

180.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, were based on Plaintiff's race, black and national origin, Jamaican.

---

[13]Such a review normally takes a couple of days.

181.

IBM's internal policies and practices have systematically had an adverse impact on blacks, because of their race, resulting in unfair discipline and wrongful termination.

## COUNT II
## Hostile Work Environment and Harassment

182.

Plaintiff incorporates the allegations contained in paragraphs 1 through 181, as if specifically plead herein.

183.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, constituted a hostile environment and harassment, in that the actions and/or inactions were so severe and pervasive that they altered Plaintiff's working condition and employment, and created an abusive work environment.

## COUNT III
## Disparate Treatment Pursuant to Title VII

184.

Plaintiff incorporates the allegations contained in paragraphs 1 through 183, as if specifically plead herein.

185.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, constituted disparate treatment, in that Defendant treated similarly situated (Caucasian) employees more favorable than Plaintiff because of his race and national origin.

## COUNT IV
## Failure to Hire Pursuant To Title VII

186.

Plaintiff incorporates the allegations contained in paragraphs 1 through 185, as if specifically plead herein.

187.

The actions or inaction of Defendant, IBM, and its agents, as articulated in the allegations above, constituted a failure to hire Plaintiff for the ASR position, in that Plaintiff was qualified for the position and rejected because of his race, and national origin, and was in retaliation of the complaints Plaintiff made against Mr. Vodopia.

## COUNT V
## Title VII and Retaliation

188.

Plaintiff incorporates the allegations contained in paragraphs 1 through 187, as if specifically pled herein.

35

189.

The actions and/or inactions of Defendant, IBM, and its agents, as articulated in the allegations above, constituted Retaliation, in that Defendant took adverse action against Plaintiff because he engaged in statutorily protected conduct and expression.

190.

All actions of Defendant, IBM, as complained of above, and other discriminatory actions not referenced herein, were on account of Plaintiff's race and national origin, and in retaliation of the complaints Plaintiff made.

191.

IBM was made aware of Plaintiff's complaints and the discriminatory and retaliatory activities of its agents and failed to address them.

192.

The actions of Defendant, IBM, was willful, wanton, intentional and in reckless disregard of Plaintiff's federally protected rights.

193.

Plaintiff has been harmed and has suffered as a result of the conduct of the Defendant, and Plaintiff is entitled to damages under the provisions of and in accordance with Title VII including compensatory damages, back pay, front pay, punitive damages and cost of litigation, all to be determined at trial.

# (ALL DEFENDNTS)

## COUNT V
## 42 U.S.C. §1981

194.

Plaintiff incorporates the allegations contained in paragraphs 1 through 193 as specifically plead herein.

195.

Defendants, by their conduct, actions and/or inactions, have violated Plaintiff's Fourteenth Amendment right of equal protection and equal right to contract.

196.

As a result of Defendants' conduct, actions and/or inactions, Plaintiff has suffered humiliation and embarrassment constituting mental anguish and suffering, and Plaintiff is entitled to an award of damages to be determined by a fair and impartial jury.

197.

As a result of Defendants' conduct, actions, and/or inactions, Plaintiff is entitled to punitive damages as allowed under the law.

## COUNT VI
## Intentional Infliction of Emotional Distress

198.

Plaintiff incorporates the allegations contained in paragraphs 1 through 197.

199.

Defendants' conduct, actions, and/or inactions, were extreme, outrageous and insulting, so as to naturally cause pain and suffering, humiliation and embarrassment on the part of Plaintiff, such that Plaintiff is entitled to recover damages for emotional distress caused by Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court allows this case to go forward, that a jury be empanelled, and that Plaintiff recover:

(a)     Actual and consequential damages as proven;

(b)     Compensatory damages;

(c)     Punitive damages payable to Plaintiff as allowed by law and as decided by a fair and impartial jury so as to punish Defendants and to deter future discriminatory and unlawful conduct;

(d)     Prejudgment interest on back pay;

(e)     All relief to which Plaintiff is entitled under Title VII and §1981;

(f)     All relief to which Plaintiff is entitled under state law claims;

(g)    Costs of litigation and attorneys fees;

(h)    All other relief to which Plaintiff is entitled under the law.

### JURY DEMAND

Plaintiff requests trial by jury of all issues in this action.

Respectfully submitted this 23rd day of October, 2006.

Lucinda Perry
Georgia Bar No. 402509
Attorney for Plaintiff

6519 Spring Street
Suite B
Douglasville, Georgia  30134
770-920-4744
perrylucinda@yahoo.com

39

EEOC Form 161-B (3/98)          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (*ISSUED ON REQUEST*)

| To | Richard V. Harrison<br>2707 Forkview Place<br>Douglasville, GA 30135 | From | Atlanta District Office - 410<br>100 Alabama Street, S.W<br>Suite 4R30<br>Atlanta, GA 30303 |
|----|----|----|----|

☐  On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601 7(a))*

| EEOC Charge No | EEOC Representative | Telephone No |
|----|----|----|
| 410-2006-01197 | **Lucille Greene,**<br>**Investigator** | **(404) 562-6861** |

*(See also the additional information enclosed with this form )*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge  It has been issued at your request.  Your lawsuit under Title VII or the ADA must be filed in a federal or state court <u>**WITHIN 90 DAYS**</u> **of your receipt of this notice;** or your right to sue based on this charge will be lost  (The time limit for filing suit based on a state claim may be different )

☐  More than 180 days have passed since the filing of this charge

☒  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge

☒  The EEOC is terminating its processing of this charge

☐  The EEOC will continue to process this charge

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge  In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case  Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>**WITHIN**</u> <u>**90 DAYS**</u> **of your receipt of this Notice.**  Otherwise, *your right to sue based on the above-numbered charge will be lost.*

☐  The EEOC is continuing its handling of your ADEA case  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required )  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office

On behalf of the Commission

Enclosures(s)

*[signature]* Sylvia D. Hall for

**Bernice Williams-Kimbrough,**
**Director**

**JUL 2 8 2006**

*(Date Mailed)*

cc  IBM Corporation
    Attn: Wendy C. Wang, Attorney
    IBM Legal Department
    Southern & Southwestern Regions
    1507 LBJ Freeway
    Dallas, Texas  75234