IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RICHARD HARRISON, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:06-CV-2549-JEC-J FK |
| INTERNATIONAL BUSINESS MACHINES (IBM) CORP., | CIVIL ACTION NO. |
| Defendants. | 1:07-CV-1220-JEC-JFK |

## FINAL REPORT AND RECOMMENDATION AND ORDER

Plaintiff Richard Harrison filed the above-styled employment discrimination actions against Defendant International Business Machines ("IBM") Corp., on October 23, 2006, in civil action number 1:06-CV-2549 ("first lawsuit"), and on May 25, 2007, in civil action number 1:07-CV-1220 ("second lawsuit"). [1:06-CV-2549, Doc. 1; 1:07-CV-1220, Doc. 1]. In the first lawsuit, Plaintiff contends that Defendants subjected him to retaliation and discrimination based on race, sex and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq. [1:06-CV-2549, Doc. 7]. Plaintiff also asserts claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981. [Id.]. In his second lawsuit, Plaintiff's remaining claims are for retaliation in violation of Title VII and §

1981.[1]  [1:07-CV-1220, Doc. 2].  The cases were consolidated on October 12, 2007.

[1:06-CV-2549, Doc. 94; 1:07-CV-1220, Doc. 8].[2]  Pursuant to Rule 56 of the Federal

Rules of Civil Procedure, Defendant IBM has moved for summary judgment on all of

Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and

discovery materials submitted by the parties.  [Doc. 99].

## I.      Preliminary Issues

In a motion filed on September 19, 2008, Plaintiff Harrison objected to

Defendant IBM's filing of a second affidavit by Andrew Vodopia.  [Doc. 126].

Plaintiff contends that he will be prejudiced if the court considers the affidavit because

it contains inaccurate information regarding a request for Plaintiff's resume made by

another manager and whether a position filled by another employee was ever posted.

[Doc. 126 at 2-4].  The court disagrees with Plaintiff and concludes that it is not

necessary to disregard the affidavit at issue.  Defendant filed Vodopia's affidavit in

response to allegations made by Plaintiff in his response brief, and the affidavit assists

---

[1]In his second lawsuit, Plaintiff also asserted claims for hostile work environment and harassment, disparate treatment based on race, gender and national origin, and race and gender discrimination.  [1:07-CV-1220, Doc. 2].  However, summary judgment was granted on these claims.  [1:07-CV-1220, Docs. 64, 146].

[2]Henceforth, the court will only reference documents filed in the first lawsuit, 1:06-CV-2549, which is the lead case.

the court in understanding the facts surrounding some of the issues raised by Plaintiff. Moreover, if the evidence offered by Plaintiff disputes any statement made by Vodopia in his affidavit, then the court will disregard that portion of the affidavit. But the court will not exclude an affidavit as a whole simply because one party disagrees with some aspect of it.

Defendant IBM has filed a motion to disregard portions of Plaintiff's response to Defendant's summary judgment motion. [Doc. 122].[3] Defendant notes that many of Plaintiff's allegations are conclusory and not supported by proper citations to record evidence. Defendant also contends that Plaintiff has offered numerous inadmissible statements, has mischaracterized witnesses' testimony, and has offered unauthenticated documents. [Id.]. The court agrees with Defendant and notes the difficulty it has had in analyzing Plaintiff's claims. However, the proper procedure to address these shortcomings is to file an objection not a motion to disregard portions of Plaintiff's response, or in essence, to strike those portions of the response pursuant to Fed. R. Civ. P. 12(f).

Because Rule 12(f) explicitly provides that the object being stricken must be in a "pleading," see Fed. R. Civ. P. 12(f), "[o]nly material included in a 'pleading' may

---

[3]In civil action number 1:07-CV-1220, this motion is docketed as number 149.

3

be the subject of a motion to strike, and courts have been unwilling to construe the term broadly."  2 <u>Moore's Federal Practice</u>, § 12.37[2] (Matthew Bender 3d ed.).  The Federal Rules define a "pleading" as "a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim . . . ; a third-party complaint . . . ; and a third-party answer. . . ." Fed. R. Civ. P. 7(a).  "Motions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike." 2 <u>Moore's Federal Practice</u>, § 12.37[2] (Matthew Bender 3d ed.).  Because Defendant challenges a portion of Plaintiff's response and a response is not a pleading, the motion to disregard, or strike, is improper.  Defendant should have filed a notice of objection instead. The motion [Doc. 122, 1:06-CV-2549; Doc. 149, 1:06-CV-1220] is, therefore, **DENIED**; however, the court will treat the motion as a notice of objection.

Plaintiff's statement of material facts and his response to Defendant's summary judgment motion are comprised of many conclusory allegations and statements setting forth legal conclusions.  These are "insufficient to meet the plaintiff's burden" at summary judgment.  <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1557 (11th Cir. 1993).  <u>Accord</u> <u>Ellis v. England</u>, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to

4

withstand a motion for summary judgment."); <u>Ratliff v. DeKalb County</u>, 62 F.3d 338, 341 (11th Cir. 1995) ("[P]laintiffs seeking to avoid summary judgment . . . must present specific nonconclusory facts that would support a jury verdict against the particular defendant on discriminatory intent."). Local Rule 56.1B(2) provides that a respondent to a summary judgment motion must file a response to the movant's statement of material facts which directly refutes each of the movant's facts "with concise responses supported by specific citations to evidence (including page number or paragraph number)." L.R. 56.1B(2). Throughout Plaintiff's response brief and his response to Defendant's statement of material facts, Plaintiff has failed to cite to evidence in the record with specific page or paragraph numbers. Many of Plaintiff's citations consist of a series of question marks. In a notice issued to the parties on May 28, 2008, the court also stated that the parties' response briefs should not include citations to the statement of material facts. [Doc. 97 at 3]. Plaintiff has disregarded this instruction as well.

The court draws upon the undisputed facts, to the extent supported by sworn testimony or affidavits or exhibits, from Plaintiff's and Defendant's statements of material facts. The court must accept as admitted those facts which the opposing party has not "specifically controverted" with citation to relevant portions of the record.

AO 72A
(Rev.8/8
2)

L.R. 56.1B.(2), (3).  Those denials that are not explained or supported with citations to the record will not be considered by the court.  See Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc., 736 F.2d 656, 658 (11th Cir. 1984) (a party opposing summary judgment "cannot rest on his pleadings to present an issue of fact" and must "respond with affidavits, depositions, or otherwise").

The court will do its best to decipher Plaintiff's arguments.  However, it will not cull through the submitted materials searching for evidence which creates a disputed issue.  That is the obligation of Plaintiff.  See United States v. Adkinson, 135 F.3d 1363, 1378-80 (11th Cir. 1998); Johnson v. City of Ft. Lauderdale, 126 F.3d 1372, 1373 (11th Cir. 1997); Dickson v. Amoco Performance Products, Inc., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994) ("It should be the party's responsibility to direct the court's attention separately to each portion of the record which supports each of the party's distinct arguments.").

## II.  Facts

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party.  See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  However, unsupported self-serving statements by the party opposing summary judgment are

6

insufficient to avoid summary judgment.  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant IBM's motion [Doc. 99] for summary judgment.

Plaintiff Richard Harrison is a black male who was born in Jamaica West Indies. [Plaintiff's Statement of Material Facts ("PSMF") ¶ 1].  In February 2005, Andrew Vodopia, IBM's Chief Financial Officer for Open Infrastructure Offerings ("OIO"), selected Plaintiff Harrison to fill an open OIO Financial Analyst (or "FA") position. [Defendant's Statement of Material Facts ("DSMF") ¶ 1; PSMF ¶ 20].  On February 1, 2005, immediately prior to Plaintiff's hiring, Vodopia sent an email to IBM Human Resources Partner Ryeha Saifi which stated, "I want to fill my vacant OIO FA with Richard Harrison.  Jim Kavanaugh approved the hiring of this headcount in November contingent upon us winning the Bank of America deal which was signed in late December."  [PSMF ¶ 21].  The Bank of America contract had been signed on December 29, 2004, for $464,897,437.  [PSMF ¶ 20].  On February 10, 2005, shortly after Plaintiff's hiring, Vodopia stated in an email to Maryn Schwebel, Lead OIO Financial Analyst, that Plaintiff had "just accepted the FA position supporting Bank

AO 72A

(Rev.8/8 2)

of America.  He'll need to do BofA updates which will be different than the others since it's in the Agg model versus the IGF model."[4]  [Doc. 114, Tab 17, Ex. 1; PSMF ¶¶ 22, 23].  Once Plaintiff was selected, Vodopia arranged for him to attend a web-based training meeting and to be trained by Schwebel and Joanna Dumont of the IBM Global Finance ("IGF") team.  Afterwards, Plaintiff told Vodopia that he felt that he grasped the concepts very well.  [Vodopia Deposition ("Dep.") at 105-07; DSMF ¶ 2].

Judson Ficklen testified, "The Bank of America Contract specifically was set up such that it would support an FA to be involved in it.  We thought that the account was going to be administratively intensive enough to warrant having a dedicated FA to it.  So because of that we were going to have an FA that was going to be fairly dedicated on Bank of America as well as whatever other accounts they had."  [Ficklen Dep. at 224].  Plaintiff Harrison believed that providing financial analyst support for the Bank of America ("BOA") account should be his only responsibility.  [Pla. Dep. at 330, 481-83, 884; DSMF ¶ 3].  While BOA was Plaintiff's primary responsibility, he was still given other accounts.  OIO had about 35 accounts and only two OIO Financial Analysts (Plaintiff and Schwebel).  Vodopia stated that this required work to be

---

[4]Schwebel was hired by Vodopia in December 2004 to replace OIO Financial Analyst Jay Moore.  [PSMF ¶ 18].

distributed in accordance with business needs as it was not possible for one of the two to focus on a single account. [Vodopia Affidavit ("Aff.") ¶ 4; Pla. Dep. at 483; DSMF ¶ 3].

Vodopia stated that he made assignment changes in accordance with business needs and communicated his expectations to his team of Financial Analysts. [Vodopia Aff. ¶¶ 4, 5, Ex. A; Vodopia Dep., Ex. 14; DSMF ¶ 4]. Plaintiff Harrison, however, was resistant to any work outside of BOA and either complained about it to the point of having management reassign the work, or he simply refused to do it. [Pla. Dep. at 330, 333-36, 381-82, Ex. 10; Vodopia Aff. ¶¶ 4, 5, Ex. A; Vodopia Dep., Ex. 14; DSMF ¶ 4]. For example, on April 12, 2005, Vodopia asked Plaintiff to provide an expected completion date for the Bank of New York ("BONY") pricing model, which was assigned to him as early as March 3, 2005. In response to Vodopia's request, Plaintiff went to Vodopia's manager claiming that the request was "insensitive to workload demands." This resulted in the reassignment of this work to Schwebel. [Pla. Dep. at 333, 375, 382-83, Ex. 10; Vodopia Dep., Ex. 14; Vodopia Aff. ¶ 6, Ex. B; DSMF ¶ 5]. On another occasion, Plaintiff Harrison was asked to develop ideas for improving the OIO's maintenance approval process. Although Vodopia provided Plaintiff with a suggested method, Harrison simply voiced his belief that Vodopia's

9

suggestion was not viable and would not improve the process.  [Vodopia Aff. ¶ 7, Ex. C; Pla. Dep. at 389, 935-41; DSMF ¶ 6].

Vodopia stated that although Plaintiff Harrison accepted the BOA account as his responsibility, he insisted on picking and choosing the facets of his job that he wanted to do and ignored others, such as his failure to complete any pricing model updates beyond the BOA Invoicing Model (one of two models which needed to be updated for the BOA account).  [Vodopia Aff. ¶¶ 8, 9].  As a result, Plaintiff was unable to detect an inaccuracy in the models that led to IBM's client receiving inaccurate information. Schwebel then had to step in and rectify the discrepancy that Plaintiff had not detected for almost a year.  [Vodopia Dep. at 222-24, Exs. 16, 19; Vodopia Aff. ¶¶ 8, 9; Ficklen Dep. at 98-101; DSMF ¶ 7].  Similarly, when asked to complete reports on the progress of the BOA account, Plaintiff either did not do the reporting updates or provided incomplete reports to Vodopia.  And, instead of providing assigned monthly or even quarterly reports, Plaintiff submitted only two reports during the entire year of 2005. [Pla. Dep. at 533, 535-38; Vodopia Aff. ¶ 10; DSMF ¶ 8].

In late March of 2005, within a month of beginning to work for Vodopia, Plaintiff Harrison complained about or "escalated" Vodopia to Deborah Burack in Human Resources, who in turn referred Plaintiff to Stephanie Parke, Director of F&P

10

Hardware Brands for IBM Americas.  [Pla. Dep. at 239-41, 340-41, 360-61, 363-64, 338; Burack Dep. at 21-26, Exs. 1, 2; Parke Dep. at 92-95; Parke Aff. ¶ 2; DSMF ¶ 11; PSMF ¶ 34].  On Easter Sunday, March 27, 2005, Parke and Harrison talked for two hours or more regarding Plaintiff's belief that he was being micro managed by Vodopia.  Plaintiff complained that: (1) he was asked to keep his office door open or the blinds on the door cracked; (2) he was asked to change his SameTime instant messaging to "away" when he was away from the desk; and (3), while he was allowed to work from home on Tuesday and Wednesday, he was not allowed to work from home on Fridays.  [Id.].  Plaintiff admits that he did not make any claim of discrimination during this conversation.  [Pla. Dep. at 241].  Parke, however, believes that Harrison brought up his sexual orientation during the call, claiming that he noticed a change in Vodopia after he provided emergency contact information of his partner, Kevin Joseph, to his second line manager's assistant.  [Pla. Dep. at 241, 627; Parke Dep. at 94; Parke Aff. ¶ 2, Ex. A; DSMF ¶ 12].

Parke told Plaintiff Harrison that she would look into his concerns and, after conferring with Human Resources, talked to Vodopia on the next day, March 28, 2005. [Vodopia Aff. ¶ 13; DSMF ¶ 13].  During a follow up conversation with Plaintiff on the same day, Vodopia went over Plaintiff's concerns. [DSMF ¶ 14]. Plaintiff testified,

11

"And the first thing [Vodopia] said, remarked to me, in his first 15 years of working at IBM in management, right, he never been escalated before. . . ." [Pla. Dep. at 365]. Plaintiff told Vodopia that he wanted to find a new job. [DSMF ¶ 14]. Plaintiff testified, "And during the conversation, he basically told me, right, that on account of the issues that are happening between both of us now, right, he doesn't see–foresee me getting another job in IBM at all, right. And literally he said I would never get another position at IBM based on that." [Pla. Dep. at 365; PSMF ¶ 35]. In an email to Parke immediately following his meeting with Plaintiff, Vodopia wrote the following, in pertinent part:

> He also brought up that there were race related issues in his prior job and that management didn't address them adequately. He didn't want to elaborate and I didn't ask for further explanation. Nothing about sexual orientation came up. He did mention that he wanted to look for another job inside IBM and I told him that I thought the odds of him being able to get another job after 4 weeks on this job would be slim but that if I could find a back fill I would let him go.

[Doc. 140, Pla. Tab 23, Ex. 2; Vodopia Aff. ¶ 14, Ex. F]. As a result of Plaintiff stating that he wanted a new job, Vodopia and subsequently Parke gave Plaintiff verbal and written approval to look for another position. [Vodopia Aff. ¶ 14, Exs. F, G; Parke Dep. at 98-101, 105, Exs. 11, 12, 13; DSMF ¶ 14].

12

On April 12, 2005, Plaintiff Harrison again escalated Vodopia to Parke with complaints that Vodopia was insensitive to Plaintiff's workload.  [Pla. Dep. at 375; Parke Aff. ¶ 3; Vodopia Aff. ¶ 6, 15, Ex. B; DSMF ¶ 15; PSMF ¶ 36].  Plaintiff also forwarded an email to Parke wherein Vodopia asked Plaintiff to provide an estimate of how long it would take to complete a work assignment involving a BONY account.  Plaintiff cited this email as evidence of Vodopia's lack of sensitivity.  [Id.].  Thereafter, Parke again spoke to Vodopia about Plaintiff's concerns.  [Pla. Dep. at 375; Parke Aff. ¶ 3; Vodopia Aff. ¶ 6, 15, Ex. B; DSMF ¶ 15].

About three weeks later on May 2, 2005, Plaintiff Harrison again complained to Parke about his workload.  This complaint resulted from Vodopia's attempt to assign Plaintiff the task of updating the pricing model for another account, the University of Pennsylvania Medical College ("UPMC").  [Pla. Dep. at 381-84, 389, 484; DSMF ¶ 16].  In order to placate Plaintiff's complaints, the accounts for BONY and eventually UPMC were transferred to Schwebel despite her already full workload.  [Id.].

On May 19, 2005, Plaintiff Harrison forwarded Parke a series of emails regarding the OIO maintenance approval process.  [Pla. Dep. at 389-90, 393-94; Parke Aff., Ex. B; PSMF ¶ 37; DSMF ¶ 17].  Plaintiff wrote, in pertinent part, "I've been copying you on several notes to illustrate the 'waffling' on issues that I have been

13

experiencing ever since joining the OIO team. . . .  I firmly believe that Andy [Vodopia] is retaliating against me because I contacted you and for standing up for my 'rights.'  I'm pleading with you to investigate and put a stop to issues/concerns I've raised with you because it's now affecting my personal life."  [Parke Aff., Ex. B; PSMF ¶ 37; DSMF ¶ 17].  In the emails, however, Vodopia attempted to provide guidance and alternatives to Plaintiff on processing maintenance billings.  He also offered to speak with Plaintiff if he had any additional questions.  [Parke Aff., Ex. B; DSMF ¶ 17].  Because of Plaintiff's request to Parke for an investigation, the matter was turned over to IBM's Corporate Appeals Department for an Open Door investigation.  [Pla. Dep. at 389, 393-94; Parke Dep. at 109-126; Parke Aff., Ex. B; DSMF ¶ 18; PSMF ¶¶ 37, 38].

Perry Rhue, who was selected to investigate Plaintiff Harrison's concerns, initially met with Plaintiff on June 3 and June 6, 2005, but Plaintiff did not discuss his claims with Rhue in detail until June 20, 2005.  [Pla. Dep. at 389-403, Ex. 17; DSMF ¶ 19].  In notes dated June 6, 2005, Rhue wrote, "Richard stated he does not trust IBM's HR Internal Policies restating that it has an adverse affect on minorities and Blacks."  [PSMF ¶ 41; Rhue Dep., Ex. 7].  Rhue investigated Plaintiff's claims that Vodopia was micro managing him, had assigned him more work than Schwebel, and

14

had treated him unprofessionally or unfairly when Vodopia: (1) asked him to keep his office door open or the blinds on the door cracked; (2) asked him to change his SameTime instant messaging to "away" when he was away from the desk; and (3) did not allow him to work from home on Fridays.  [Pla. Dep. at 402-03, 462; Rhue Dep. at 219, Ex. 14; DSMF ¶ 20].  Rhue reviewed documentation and a time line of events provided by Plaintiff and concluded that he had not been treated unfairly.  [Id.].

Plaintiff Harrison testified that around June 24, 2005, he raised an additional concern to Rhue.  [Pla. Dep. at 403-06].  Plaintiff informed Rhue that Norbert Cardenas had been selected for an Account Service Representative ("ASR") position for which Plaintiff applied.  [Id.].  This complaint was incorporated into the existing Open Door and investigated by Michele Geiger of Corporate Appeals.[5]  [Rhue Dep. at 89, 91, 93, 227, Ex. 16; DSMF ¶ 21].  The ASR position was a "Band 7" job, the same job level as the Financial Analyst position held by Plaintiff.  [Pla. Dep. at 457-58; DSMF ¶ 22].  Although the ASR posting was originally for one position, Harry Gornick, the hiring manager, eventually was given authority for two additional ASR positions.  The

---

[5]IBM's policy recommends a 30 to 60 day investigation period but states that an investigation may extend longer due to complexity or other reasons.  [Rhue Dep. at 43-44, 170, 232, Ex. 2; DSMF ¶ 30].

15

posting was updated on June 23, 2005, to specify a preference for a candidate with "Customer Fulfillment (Customer Support Operations) experience with an emphasis on accounts receivable."  [Gornick Dep. at 149, 154, 160, 169, Exs. 15, 16; Gornick Aff. ¶ 4; DSMF ¶ 23].  On June 23, 2005, Gornick first selected Norbert Cardenas (Hispanic, male).  Gornick stated that he believed Cardenas was an ideal candidate because he had previously worked in the CSO organization doing Accounts Receivable and had held positions of CSO Expense Analyst and Accounts Receivable Team Lead. [Gornick Aff. ¶¶ 5, 6, Ex. B; Gornick Dep. at 170, 176; DSMF ¶ 24].

When the additional interviews, including Plaintiff Harrison's interview, were completed, Gornick assessed that Nancy Reno (white, female) and Roberta Coughlin (white, female) were the best qualified of the applicants.  [Gornick Aff. ¶¶ 7-9, Exs. C, D; Rhue Dep., Ex. 16; DSMF ¶ 25].  Gornick stated that he selected Reno because she had been a Customer Contracts Representative with CSO Maintenance (an area where Gornick felt his team was weak), had 4 years of experience in the CSO, and had 5 years of experience in the Customer Fulfillment Organization ("CFO"), so she understood the "ins and outs" of the fulfillment organization and who to contact when different issues arose.  [Id.].  Gornick stated that he selected Coughlin because she had the strongest Accounts Receivable experience of all the applicants.  Coughlin had been

16

a Billing Dispute Focal from CSO Accounts Receivable, had worked in CSO Accounts Receivable for years, and had excellent knowledge of how to query the accounts receivable system. [Gornick Aff. ¶¶ 7-9, Exs. C, D; Rhue Dep., Ex. 16; DSMF ¶ 25]. Gornick testified that in contrast to Reno and Coughlin, Plaintiff Harrison's resume and interview responses did not reflect customer fulfillment experience as strong as Reno and Coughlin, and he did not have accounts receivable or maintenance experience. [Gornick Dep. at 172-75; DSMF ¶ 26].

According to Gornick, on August 18, 2005, he told Plaintiff that he was not selected for the ASR position. Plaintiff responded by becoming irate and unprofessional, accusing Gornick of lying and pre-selecting Cardenas for the position before posting it. Plaintiff also claimed that he was better than the ASR's on Gornick's team. The next day, August 19, Gornick sent an email to Vodopia describing his conversation with Plaintiff. [Gornick Dep. at 215, Ex. 30; DSMF ¶ 27]. Gornick testified that he was never told by Plaintiff Harrison or Vodopia that Plaintiff raised concerns about discrimination. Gornick also stated that he had not been told that Plaintiff had commenced an Open Door investigation until he was contacted by Geiger. This was after Gornick had made his decisions to hire Cardenas, Coughlin and Reno. [Gornick Dep. at 135, 154-55, 191; Gornick Aff. ¶ 11; DSMF ¶ 28].

17

Geiger's investigation concluded that Plaintiff Harrison was treated fairly and that Gornick selected the applicants who were best qualified in terms of CSO/Fulfillment experience and accounts receivable experience. The investigation report was approved by Gabriel Graciosi, the assigned reviewing executive, and later communicated to Plaintiff. [Pla. Dep. at 460, 478, 480, Exs. 13, 18; Rhue Dep. at 89, 91, 185-86, 227, Exs. 10, 13, 14, 16; DSMF ¶ 29].

Vodopia stated that after the Open Door investigation was complete, whenever Vodopia made an attempt to set deadlines or get a clear sense of Plaintiff Harrison's workload, Plaintiff continued to resist and strike out unprofessionally. [Vodopia Aff. ¶ 16, 17, Exs. H, I; DSMF ¶ 32]. On one occasion in August 2005, Vodopia met with Plaintiff for 40 minutes to review his work and any progress made on the issues he encountered. In an email sent to Stephanie Parke, Vodopia described the meeting as follows:

> The first 30 minutes of the conversation were extremely positive. . . . Then I asked him to put some revenue data on the chart and his mood dramatically changed. I told him he could get the information from Rhonda Baker who is the FOL at Bank of America. He physically started twitching and became belligerent. He told me he was tired of being treated this way. That he was black and had an accent but that didn't make him stupid. That he knew I lied to the open door investigator. That he had been blackballed by IBM from getting an internal job and that the

18

> truth would come out soon.  He became increasing [sic] agitated, and quite frankly, I was getting a little nervous.

[Vodopia Aff. ¶ 12, Ex. E].  In September 2005, Vodopia asked Plaintiff how much time it took him to complete various tasks associated with BOA, but Harrison never answered the question.  [Vodopia Aff. ¶ 16, 17, Exs. H, I; DSMF ¶ 32].  And, in November 2005, Vodopia sent out a reminder for Plaintiff to submit the draft desk procedure that was already over two weeks late and offered him an additional week.  However, Harrison replied that he would "appreciate it if [Vodopia] would stop [his] ongoing efforts to incriminate [him]."  [Id.].  On another occasion, Vodopia requested that Plaintiff update the ADP model, but he never completed that assigned task.  [Vodopia Aff. ¶ 16, 17, Exs. H, I; DSMF ¶ 32].

On November 8, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff checked the boxes for retaliation and race, sex, and national origin discrimination.  In the narrative section, Plaintiff mentioned that he was not selected for the ASR position.  [Doc. 114, Tab 30; Pla. Dep., Ex. 6; PSMF ¶ 51; DSMF ¶ 71].

Plaintiff Harrison went on leave in early November 2005.  At that time, Schwebel acquired the BOA account, which was Plaintiff's only responsibility.  Tasha

19

Galloway was hired as an OIO Financial Analyst in January 2006, and at that time, the BOA account was transferred to her. [Vodopia Dep. at 388; Vodopia Aff. ¶ 11; Pla. Dep. at 491-92; DSMF ¶ 33]. Schwebel was scheduled to leave IBM by early April 2006 but Vodopia negotiated for Schwebel to remain on BOA for several months after she left the Atlanta area. [Vodopia Aff. ¶ 20; DSMF ¶ 35]. Vodopia stated that he decided to keep Schwebel on the BOA account because the role had taken on "a life of its own" due to Schwebel's involvement. Schwebel had fixed discrepancies that Plaintiff did not detect and revamped the Financial Analyst's role on BOA (changing models and updates), such that BOA was extremely satisfied with Schwebel's performance. Vodopia stated that he believed it would have negatively affected IBM's relationship with BOA to disengage Schwebel from the account at that time. [Vodopia Dep. at 212; Vodopia Aff. ¶ 20; DSMF ¶ 38].

When Plaintiff Harrison returned from leave on March 27, 2006, Vodopia informed him that he would be working on BONY and Kaiser instead of BOA and that he would be given his own office, next to Galloway. [Pla. Dep. at 491-92, 736; Vodopia Aff. ¶ 21; DSMF ¶ 36]. Vodopia stated that he moved Plaintiff's office primarily because Schwebel had requested not to share an office with Plaintiff. When Vodopia entered the office, he found that the lights were dim. He immediately moved

20

Harrison to another office near Vodopia's.  [Vodopia Aff. ¶ 21; Pla. Dep. at 723, 803-04; DSMF ¶ 37].

Vodopia also informed Plaintiff Harrison that arrangements would be made for training on his new assignment and, in the meantime, asked Plaintiff to assist Galloway with an emergency assignment on an order letter log given to Galloway on short notice, by printing some documents for Galloway.  [Vodopia Aff. ¶ 20; Pla. Dep. at 881-83; DSMF ¶ 39].  Within two days of returning from leave in late March 2006, Plaintiff was scheduled to be trained by Patricia Feeney, lead ASR.  The training, however, ended abruptly in less than 10 minutes because, according to Feeney, Plaintiff called her and Schwebel "phonies" and went on an tirade that caused Feeney to leave the office "shaking."  Plaintiff testified that he did not call them "phonies" but told them that he was "allergic to phoniness."  [Pla. Dep. at 750, 762-63; Feeney Dep. at 195-96, 216, 219, 221, Ex. 11; Vodopia Dep. at 368-69, Ex. 30; Vodopia Aff. ¶ 23; Gornick Dep. at 188-89; DSMF ¶ 41].

Stephanie Parke stated that she spoke with Plaintiff Harrison on March 30, 2006, regarding his meeting with Feeney and Schwebel.  According to Parke, Plaintiff shared that he feared Vodopia would kill him and thought he needed a restraining order.  As a result, Parke gave Plaintiff (whom she later described as very frantic, distraught and

21

volatile) permission to work from home until further notice.  [Parke Dep. at 245; Parke Aff. ¶ 5, Ex. A; Pla. Dep. at 728; DSMF ¶ 42; PSMF ¶ 52].  Due to these allegations, Human Resources engaged Global Well-Being Services ("GWBS"), who contacted Plaintiff's physician to make sure that he was ready to return to work.  Within a week, Plaintiff's doctor reported to GWBS that Plaintiff Harrison "seems ok." [Pla. Dep. at 733-34; Ames Dep. at 53, 101, Ex. 7; Shum Dep. at 211-13, 216; DSMF ¶ 43].  Plaintiff's physician, Dr. Edward Ajayi, stated in his affidavit that he received a telephone call from IBM's medical staff on March 31, 2006, and he described the ensuing conversation as follows:

> During the discussion, I was informed by the medical doctor that Mr. Richard Harrison was not behaving okay and that he (Mr. Harrison) was accusing his manager of harassment and trying to set him up to fail.  The doctor requested that I re-evaluate Mr. Richard Harrison based on his reported behavior. . . .  Mr. Harrison was consequently re-evaluated by me on April 1, 2006.  The evaluation was clinical unremarkable. . . .

[Ajayi Aff. ¶¶ 4, 5; PSMF ¶ 53].

On April 3, 2006, a week after returning from his leave of absence, Plaintiff filed a second EEOC charge of discrimination alleging IBM retaliated against him for filing his first charge.  [Doc. 114, Tab 32; Pla. Dep. at 710, Ex. 7; DSMF ¶ 73; PSMF ¶ 54].  In the charge, Plaintiff wrote, in part, the following:

22

> Since my return to work on March 27, 2006, my Supervisor, Andy Vodopia, has retaliated against me by removing me from office, taking away my contract work on Bank of America, giving me performance goals that are unattainable, giving me mundane work, giving me contradictory instructions, and not completing my 2005 performance evaluation. IBM staff, Betty M. Johnson of IBM Global Wellbeing Services and Health Benefits, contacted my private doctor (specialist), unknown to me, and requested that he evaluate me again on the basis of complaints of my "hostile" behavior from several managers.

[Doc. 114, Tab 32; PSMF ¶ 54].

After Plaintiff's doctor confirmed his belief that Plaintiff Harrison was ready to return to work, IBM continued with efforts to get Plaintiff trained, which efforts were led by Feeney and Dumont because both had extensive experience with updating pricing models. [Ames Dep. at 95; Shum Dep. at 212, 220; Vodopia Aff. ¶ 24; DSMF ¶ 45]. The training, which was done by telephone conference on April 24, 2006, was also attended by Vodopia, Parke and Marie Schram, who was Gornick's replacement as Manager of the ASR's. Follow-up training was held weeks later, and Plaintiff said afterwards that he felt that he was well-equipped to complete the work assigned and issued Dumont a "thanks award" for the great training. [Vodopia Aff. ¶ 24, Ex. J; Parke Dep. at 163-64; DSMF ¶ 46].

In mid-April 2006, Phyllis Helms (Assistant to Al Wells, Director of Employee Relations) sent an email to Appeals Program Manager Windall White and Wells which

AO 72A
(Rev.8/8
2)

was entitled "Awaiting Recommendation by April 24, 2006." [Doc. 114, Tab 9, Ex.

1; PSMF ¶ 12]. In the email, Helms stated the following:

> Windall, Mr. Harrison is a long-time 'appealer' [ ] we have 6 cases since
> 2003 ranging from citing [management] for instructing him to misreport
> revenue, retaliation, medical privacy issues, 2 [review] ratings to name a
> few of the issues included.  Please contact Mike Shum and determine if
> we [Corporate Appeals] should be handling this or is it being handled by
> him as a local case.  Note: I can't tell if his STD has ended.

[Doc. 114, Tab 9, Ex. 1; PSMF ¶ 12].

In or around May 2006, Vodopia and Parke held a formal performance review

meeting with Plaintiff Harrison to go over his 2005 review, referred to as a Personal

Business Commitment ("PBC").  Vodopia had given Plaintiff a rating of 3, which is

classified as the "lowest contributor" rating.  Vodopia specifically described the

reasons for this rating.  [Vodopia Aff. ¶ 26; Parke Dep. at 60-61; DSMF ¶ 48].

Vodopia stated that he engaged the assistance of Human Resources in order to ensure

that the 2005 PBC review was clear, fair and well supported by facts.  Human

Resources, in turn, engaged Employee Relations.  [Vodopia Aff. ¶ 26; Parke Dep. at

60; Ames Dep. at 72-76; Shum Dep. at 79-81; DSMF ¶ 49].

On June 7, 2006, an Employee Relations staff member named Kevin Sullivan

sent an email to Human Resources Partner Michelle Ames and Human Resources

AO 72A

(Rev.8/8

2)

Director Mike Shum.  [Doc. 114, Tab 26].  Referring to Plaintiff Harrison, Sullivan

wrote:

> In my view, I would still try to give the open door approach a try.  What
> if we could line up someone like Drew Valentine?  He is a minority, an
> executive, and has experience working in diversity (plus, he is an
> attorney).  He is very good handling situations like this.  What do you
> think, Mike?  If we can line up someone like Drew, and then try to
> convince Richard to use the open door process again, I think that gives us
> the best chance of moving this forward–and demonstrating that we're
> making good faith efforts to resolve this.  I just don't see us making
> headway any other way.

[Doc. 114, Tab 26].

In late June 2006, after reaching two large and complicated order letters that

needed to be input, Plaintiff met with Parke and Vodopia.  According to Vodopia,

Plaintiff informed them that he did not think he would ever be able to understand the

BONY model.  In response, Vodopia reassigned the BONY model to Ron Rueckert,

who had been hired as an OIO Financial Analyst in April 2006 after Schwebel left.

[Vodopia Dep. at 383; Vodopia Aff. ¶ 25; DSMF ¶ 47].  On July 19, 2006, Plaintiff

requested two "Right To Sue" letters from the EEOC relating to his two EEOC

complaints.  [PSMF ¶ 55].

Plaintiff alleges that in August 2006, Jorge Colon expressed interest in hiring

Plaintiff and asked Vodopia to send him Plaintiff's resume.  [Doc. 114 at 30; Vodopia

25

Dep., Ex. 21].  According to Plaintiff, "Vodopia falsified information and requested that Plaintiff send Vodopia his resume for 'head Count Planning purposes.'"  [Doc. 114 at 30].  Vodopia told Colon to contact Plaintiff directly for his resume, and in an August 2006 email, he informed Colon that Plaintiff "is very conscientious about his work but needs a lot of direction.  Don't expect a lot of analysis but if it's something that is routine and repeatable he is dependable."  [Vodopia Dep., Ex. 21; Doc. 114 at 30].

On August 9, 2006, Plaintiff Harrison again escalated Vodopia to Parke and complained about unfair treatment.  [PSMF ¶ 57].  A week later, Plaintiff wrote Parke an email which stated the following:

> Hi Stephanie, last Wednesday (08/09/06) I had a conference call with you to address certain issues related to unfair treatment I've been, and still am subjected to from Andy.  At the end of our discussion, I requested an Internal Appeal, preferably a "Panel Review," however, you said you would have to consult the Human Resources department who would make the final decision.  To date, IBM's Human Resource department has not contacted me, and Andy's unfair treatment towards me has only escalated.  Could you please let me know the status of my appeal as I'm finding [it] very difficult to concentrate on my work on account for [sic] the unfair treatment?

[Doc. 114, Tab 34, Ex. 2; PSMF ¶ 58].  Parke responded that day and informed Plaintiff that an employee from Human Resources would "respond to you with regard

AO 72A

(Rev.8/8 2)

to an appeal for the mistreatment that you feel you have received." [Doc. 114, Tab 34, Ex. 2; PSMF ¶ 59]. The next day, August 17, 2006, Human Resources Director Mike Shum contacted Plaintiff by email and asked Plaintiff to articulate the specific issues he wanted IBM to investigate. [Doc. 114, Tab 34, Ex. 2; PSMF ¶ 60].

In August 2006, Rueckert, the OIO Financial Analyst hired in April, went into Plaintiff Harrison's office to listen in on a telephone conference. According to Rueckert, he did this because he had misplaced the call-in number. Plaintiff testified that afterwards, he told Rueckert that he "had to question his motive for just walking in [Plaintiff's] office uninvited in the manner in which he did." [Pla. Dep. at 876]. Plaintiff described his discussion with Rueckert in the following way:

> [H]e said, ["]oh, I thought I could just walk in your office. In my previous job I used to do that and it was not a problem.["] I said, ["]Ron, basically, this is the first time. And given the situation with Andy, I question that. . . . [C]ouldn't you have taken it in Andy's office? Like you had to pass Andy's office to come to my office. Why didn't you take it in Andy's office.["] . . . ["]Andy was on the phone,["] he said. . . . But I said, ["]Ron, it's the same call and you always take it in Andy's office.["] And at that point I told him . . . ["]Ron, I might have an accent, I might be Jamaican, right, but it does not equate to stupidity. I don't believe anything you just told me there.["] And I just said to him, ["]Ron, I'm just going to advise you to stay out of what you don't understand what's going on.["]

[Pla. Dep. at 876-77].

27

Vodopia stated that because Harrison received a 3 on his 2005 PBC, Vodopia and Parke set up an interim review meeting to go over Plaintiff's performance in September 2006.  This was a date about half way between late March 2006, when Plaintiff returned from leave, and January 2007, the end of the annual review cycle. During the review, Vodopia explained to Plaintiff that his performance had not improved and that he needed to accept additional assignments to level his workload with the other Financial Analysts.  [Vodopia Aff. ¶¶ 28-29, Exs. M, N; DSMF ¶ 50]. At Plaintiff's request during the Interim Review meeting, Vodopia agreed not to assign any additional work until October 2006, so that Plaintiff could get through the quarter close.  However, in October 2006, when Vodopia began to try to add assignments to Plaintiff's responsibility, Plaintiff was resistant to the additions and maintained his resistance through the day that his first lawsuit was filed.  [Vodopia Aff. ¶¶ 29-30, Exs. M, O; Parke Dep., Ex. 33; DSMF ¶ 51].

On September 7, 2006, Human Resources Partner Michelle Ames responded to an inquiry from Parke by writing the following, in pertinent part:

> Richard withdrew his request for an appeal.  This seems to be the result of outside counsel.  As we discussed, the EEOC issued a 'right to sue' and he could be planning to exercise that right. . . .  The key moving forward and the closer we get to year-end will be to continue to manage his performance as necessary.

28

[PSMF ¶ 63; Doc. 114, Tab 36, Ex. 1].  Parke responded to Ames by writing, "I think we should regroup on an interim performance evaluation for Richard.  I'll set it up." [PSMF ¶ 64; Doc. 114, Tab 36, Ex. 1].  Parke also wrote the following to Vodopia: "Shouldn't we be setting up a discussion on this?  I think he's owed an internal evaluation."  [PSMF ¶ 64].

In late September of 2006, a series of emails regarding Plaintiff Harrison had been sent and received by the following IBM employees: Kevin Sullivan of Employee Relations, Appeals Program Director Al Wells, Appeals Program Manager Windall White, Director of Business Controls Vince McRuiz, Internal Audit Manager Michael Silverstein, Human Resources Partner Michelle Ames, Human Resources Director Mike Shum, Director of Employee Relations Robert Paloncy, and Appeals Program Manager Carolyn Austin.  [Doc. 114, Tab 8; PSMF ¶ 11].  The email series included the following statements from Appeals Program Manager Windall White:

> I had some earlier involvement with Harrison in the March and May time frame when he was insisting on using the Panel Review for discrimination, harassment, and hostile work environment.  When he was informed we would investigate his issues via Open Door he went away.  He later returned in August stating he was with dawning [sic] his internal appeal on advice of legal counsel.  The item below is new to me but I have a history with Mike Shum and Richard from earlier in the year.

[Doc. 114, Tab 8; PSMF ¶ 11].

29

In October 2006, Vodopia instructed IBM's Coordinator for "Americas Finance Board Resource Meeting" to show Plaintiff's date of availability for a new position as being the fourth quarter of 2006. [PSMF ¶ 49]. Records had previously stated that Plaintiff's availability date was the third quarter of 2006. [Id.]. Plaintiff writes, "Vodopia and Parke claimed that Plaintiff was available to leave since March 2005." [Id.].

On October 23, 2006, Plaintiff Harrison filed his first lawsuit against IBM, claiming race, sex, and national origin discrimination and retaliation. [Doc. 1; PSMF ¶ 66]. On October 24, 2006, when Parke was informed by Human Resources Director Mike Shum that Plaintiff has retained an attorney, she wrote, "[W]e're also approaching the pbc cycle." [PSMF ¶ 64]. Three weeks later, on November 16, 2006, Plaintiff went on medical leave and did not return to work until January 2, 2007. [Pla. Dep. II at 89; PSMF ¶ 71; DSMF ¶ 52]. Pursuant to the decisions made in or around June 2006, for reassigning Plaintiff's workload, Plaintiff's other accounts were transitioned to ASR/CSO while Harrison was on medical leave. [Schram Dep. at 52-53; Vodopia Aff. ¶ 33; DSMF ¶ 57]. In December 2006, shortly before Plaintiff returned from leave, Vodopia instructed Plaintiff to complete his 2006 PBC. [PSMF ¶ 72].

30

On January 8, 2007, shortly after Plaintiff returned from medical leave, Vodopia relieved Plaintiff of his prior job duties and assigned new job duties including: (1) updating the pricing models and contract performance for UPMC, Verizon, and Depository Trust & Clearing Corporation ("DTCC"); and (2) completing contract performance for BONY. [Pl. Dep. II at 109, Ex. N; PSMF ¶ 72; DSMF ¶ 54]. Both Verizon and the DTCC accounts were new signings and, as a result, did not have pre-existing reconciliation issues and did not require significant updates due to inactivity. Further, Verizon was a relatively simple account to update as it was not financed through IBM. [Pla. Dep. II at 109-14, Ex. HH; Vodopia Aff. ¶ 33; DSMF ¶ 55]. Vodopia stated that it was critical to bring the UPMC account up to date as Vodopia's supervisors specifically asked about the contract performance of UPMC. [Vodopia Aff. ¶ 33; DSMF ¶ 56].

On January 16, 2007, Vodopia and Parke held a formal performance review meeting with Plaintiff Harrison to go over his 2006 PBC. Vodopia gave Plaintiff a rating of 3, which is a "lowest contributor" rating, and Vodopia described the reasons for this rating. [Pla. Dep. II at 162-63, Ex. U; DSMF ¶ 58]. Pursuant to IBM's practices and policies, because Plaintiff was rated a 3 in two consecutive PBC's, during the January 16, 2007 meeting, he was informed he had 30 days in which to improve his

31

performance or he would be placed on a formal 30-day Performance Improvement Plan ("PIP").  Moreover, he was informed that he was no longer eligible to transfer to another position within IBM and was offered a separation package (which he later rejected) as an alternative.[6]  [Pla. Dep. II at 192-93, 196, 199, 204, Exs. V, W; Ames Aff. ¶ 4; PSMF ¶ 73; DSMF ¶ 59.  Specifically, regarding his performance in 2006, Plaintiff's PBC review explained that he: (1) was unable to complete updating the BONY, Kaiser, and UPMC models in the time frame expected by management; (2) was unable to reconcile any of his contracts; (3) did not keep desk procedures current and audit ready; (4) failed to complete the order letter log in a timely manner as it took him approximately 20 hours to complete while, according Vodopia, it normally takes only 6 hours per week; (5) struggled with ad hoc requests to pull information from models, in one case claiming that the information could not be obtained, although it was later pulled in less than 30 minutes; (6) did not manage his time well and reacted negatively to management assistance and suggestions for completing tasks more effectively; (7) failed to use resources available to help him resolve any difficulties; and (8) was

---

[6]On February 1, 2007, Vodopia sent a note to Human Resources Partner Michelle Ames which stated the following: "Also, as part of the package [Plaintiff] has in front of him now, does he have to sign something that says he won't sue IBM? That's been a standard term in the past on resource actions and I'm wondering if that is the case with this package."  [PSMF ¶ 74; Doc. 114, Tab 42].

AO 72A
(Rev.8/8
2)

frequently uncooperative in handling his work relationships.  [Pla. Dep. II at 169-74,

185-87, Ex. U; DSMF ¶ 60].  Plaintiff disagreed with his 2006 PBC rating.  [Pla. Dep.

II at 171, 173-74, 178, Ex. U; DSMF ¶ 61].

On January 26, 2007, Plaintiff filed a third EEOC charge of discrimination,

alleging that his pending termination was in retaliation for pursuing his lawsuit against

IBM.  [Pla. Dep. II at 161-62, Ex. T; DSMF ¶ 74].  Plaintiff wrote, in part:

> On December 13, 2006, Respondent was served with a lawsuit brought
> against it by Charging Party for discrimination and retaliation in violation
> of Title VII and/or 42 U.S.C. § 1981. . . .  On January 16, 2007,
> Respondent informed charging party that he was being terminated the
> following month.  Respondent's termination is in retaliation for his
> protected activity in pursuing his suit for discrimination.

[Pla. Dep. II at 161-62, Ex. T].

On February 23, 2007, Plaintiff Harrison met with Stanley Sutula, Vice

President of the Americas Finance and Operations division and Parke's superior, to

voice his complaints.  Afterward, Sutula looked into Plaintiff's concerns and informed

Plaintiff that he did not believe he was being treated unfairly by his management team.

Sutula also reminded Plaintiff that the Open Door investigation process through IBM

Appeals was available to him for his harassment allegations.  [Pla. Dep. II at 32-34,

233-34, 236-39, Exs. E, EE; DSMF ¶ 62].  Although Plaintiff previously requested a

33

panel review, he was only eligible to use the Open Door investigation process because his complaints involved allegations of harassment.  [Mandel Dep. at 76-77; Pla. Dep. at 842-43; DSMF ¶ 63].

In the 30-day period following the 2006 PBC meeting, Plaintiff Harrison: (1) failed to make any updates to the Verizon or DTCC accounts; (2) only updated one partial order letter for the UPMC account; (3) and did not complete the revenue and profit analysis on Verizon, DTCC, UPMC, or BONY.  [Pla. Dep. II, Exs. GG, HH; DSMF ¶ 64].   Accordingly, on February 26, 2007, Plaintiff was rated a 4 or unsatisfactory, and pursuant to IBM's polices, he was placed on a PIP and given 30 days within which to improve his performance.  [Pla. Dep. II at 199, 243-44, Exs. GG, HH; DSMF ¶ 65].

On March 8, 2007, Human Resources Partner Michelle Ames wrote an email to Human Resources Director Mike Shum and discussed Plaintiff's history.  Ames stated, in part:

> There are other factors related to this case.  This individual filed two EEOC charges against IBM in 2006 (the main allegation for the first charge was discrimination for not been [sic] selected for a role he applied and the second was for retaliation).  The EEOC issued right to sue [letters] for both charges and this individual filed a lawsuit.  Since that time another EEOC charge was filed for retaliation.

AO 72A

(Rev.8/8 2)

[Pla. Dep. at 783, 826; Doc. 114, Tab 7; PSMF ¶ 10].  Pursuant to the PIP process, on March 1, March 8, and March 15, 2007, Plaintiff attended weekly meetings to assess the progress on his performance, but he refused to provide any updates on his work and replied to questions regarding the status of his assignments by only saying, "No comment." [Pla. Dep. II at 250-51, 253, 256-57, 259, Ex. II; DSMF ¶ 66].  The fourth PIP meeting was supposed to take place on March 22, 2007, but Plaintiff was out sick that day.  He then requested a week of vacation from March 26 through March 30, 2007, so Parke rescheduled the meeting for April 2, 2007.  [Pla. Dep. II at 261, 267, 269, Exs. JJ, KK; DSMF ¶ 67].

On March 28, 2007, the 30-day PIP period ended, and on March 29, 2007, IBM management determined that Plaintiff Harrison did not meet the objectives of the PIP and his employment would be terminated.  This was based on the assertion that Plaintiff's work remained unsatisfactory and that he refused to inform his management team about his progress.  [Pla. Dep. II at 243, 247, 288, Exs. MM, NN; DSMF ¶ 68].  On Monday, April 2, 2007, when Parke and Ames contacted Plaintiff for their scheduled conference call and final PIP meeting, Plaintiff would not participate in the call because he was on sick leave.  As a result, Parke informed Plaintiff of the

35

termination decision by letter and email on that same day.  [Pla. Dep. II at 268, Exs.

MM, NN; DSMF ¶ 69].  The email stated, in part:

> This is to inform you that . . . on March 29th it was determined that you did not meet the objectives of your 30-day Performance Improvement Plan which ended on March 28th, 2007.  Due to your vacation plans we were unable to communicate this decision to you before today. Therefore, your IBM employment will be terminated effective today, April 2, 2007.

[Pla. Dep. II at 268, Ex. MM].  Plaintiff filed his second lawsuit against IBM on May

25, 2007.  [1:07-CV-1220, Doc. 1].  Plaintiff alleged claims of retaliation in violation

of Title VII and 42 U.S.C. §1981, hostile work environment and harassment, disparate

treatment based on his race, gender and national origin, and race and gender

discrimination.  [Id.].

Additional facts will be set forth below as they become necessary for discussion

of Plaintiff's claims.

## III.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates the entry of

AO 72A
(Rev.8/8
2)

summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).

The movant bears the initial burden of asserting the basis of its motion, and that burden is a light one. See Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The movant is not required to negate its opponent's claim. See id. Rather, the movant may discharge this burden merely by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." Id. at 325, 106 S. Ct. at 2554. When this burden is met, the non-moving party is then required to "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)).

37

While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, see Rollins, 833 F.2d at 1529; Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987), that party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The non-moving party must come forward with specific facts showing there is a genuine issue for trial.  See id. at 587.  An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative."  Anderson, 477 U.S. at 249-50, 106 S. Ct. at 2511; accord Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988).  Similarly, substantive law will identify which facts are material.  See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element essential to its case.  See Celotex, 477 U.S. at 323, 106 S. Ct. at 2553; Rollins, 833 F.2d at 1528.

**IV.   Discussion**

Plaintiff Richard Harrison contends that Defendant IBM subjected him to retaliation and discrimination based on race, sex and national origin in violation of Title VII.  [1:06-CV-2549, Doc. 7; 1:07-CV-1220, Doc. 2].  Plaintiff also asserts

38

claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981.  [Id.].

Plaintiff claims that a number of adverse employment actions were taken against him,

such as being denied various positions and ultimately being terminated from his

employment with Defendant IBM.  [Doc. 114].  Defendant has moved for summary

judgment on all of Plaintiff's claims.  [Doc. 99].

## A.    Discrimination Claims

Plaintiff Harrison alleges that he was subjected to discrimination based on race,

sex and national origin when Defendant IBM denied him three Account Service

Representative ("ASR") positions, "blackballed" him with respect to "another

Financial Analyst position," falsified his availability date in late 2006, and denied him

the opportunity to transfer to another position.[7]  [Doc. 114 at 39].  Title VII makes it

unlawful for an employer "to discriminate against any individual with respect to his

---

[7]Plaintiff also claims in his response brief that he was subjected to discrimination when he was "[d]enied compensation, merit increases, bonuses and/or awards, and his ultimate termination. . . ."  [Doc. 114 at 39].  With regard to Plaintiff's claims of discrimination in terms of pay, these will not be addressed by the court because they were not raised prior to his summary judgment response.  "Any claims not asserted in the plaintiff's Complaint are properly dismissed."  Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004) (citing Coon v. Georgia Pac. Corp., 829 F.2d 1563, 1568-71 (11th Cir. 1987)).  Plaintiff's claim of discriminatory termination was dismissed when Defendant's summary judgment motion was granted on this claim.  [1:07-CV-1220, Docs. 64, 146].  As noted supra in n.1, the only viable claim based on Plaintiff's termination is one for retaliation.

39

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). With regard to his race discrimination claim, Plaintiff seeks to use § 1981 as a parallel basis for relief with Title VII. The elements required to establish a § 1981 claim mirror those required for a Title VII claim. As the Eleventh Circuit has noted, "Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). This court will do the same.

The court notes initially that Plaintiff Harrison argues that he is able to produce direct evidence of discrimination. [Doc. 114 at 11-13]. "'Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.'" Merritt v. Dillard Paper Company, 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting Mize v. Jefferson City Board of Educ., 93 F.3d 739, 742 (11th Cir. 1996)). Direct evidence is defined as "'evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute

40

direct evidence.'"  Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quoting

Merritt, 120 F.3d at 1189). Eleventh Circuit precedent establishes that "direct evidence

is composed of 'only the most blatant remarks, whose intent could be nothing other

than to discriminate' on the basis of some impermissible factor."  Schoenfeld v.

Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting Carter v. City of Miami, 870

F.2d 578, 582 (11th Cir. 1989)); see also Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555

(11th Cir. 1990) (direct evidence exists where "actions or statements of an employer

reflect[ ] a discriminatory or retaliatory attitude correlating to the discrimination or

retaliation complained of by the employee").  In Earley v. Champion Int'l Corp., 907

F.2d 1077, 1081 (11th Cir. 1990), the Court stated, "One example of direct evidence

would be a management memorandum saying, 'Fire Earley--he is too old.'"  "If the

alleged statement suggests, but does not prove, a discriminatory motive, then it is

circumstantial evidence."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th

Cir. 2004).

Plaintiff Harrison, in support of his argument that he is able to offer direct

evidence of discrimination, cites to Judge Tjoflat's opinion in Wright v. Southland

Corporation, 187 F.3d 1287 (11th Cir. 1999).  According to Plaintiff, the definition of

direct evidence used in the Eleventh Circuit is not the traditional definition but is rather

a "preponderance" definition which Judge Tjoflat characterized as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic."  Id. at 1293.  As other courts have noted, Judge Tjoflat's definition of direct evidence "is mere obiter dictum, as it was not necessary to the resolution of the case, and neither of the two other members of the panel joined that portion of the opinion."  Copley v. Bax Global, Inc., 80 F. Supp. 2d 1342, 1348 (S.D. Fla. 2000); see also Ferrell v. Masland Carpets, Inc., 97 F. Supp. 2d 1114, 1122 n.11 (S.D. Ala. 2000).  "Indeed, as the Copley court observes, the Eleventh Circuit has not since applied Judge Tjoflat's definition of direct evidence."  Ferrell, 97 F. Supp. 2d at 1122 n.11 (citing Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354, 1358-59 (11th Cir. 1999); Beaver v. Rayonier, Inc., 200 F.3d 723, 729-30 (11th Cir. 1999)).  For these reasons, the undersigned declines to adopt Plaintiff's proposed definition of direct evidence.

Plaintiff Harrison contends that direct evidence of discrimination can be found in the fact that Human Resources Partners Deborah Burack and Christine Wheaton, when selecting a person to investigate Plaintiff's concerns in mid-2005, discussed the fact that investigator Perry Rhue was black. [Doc. 114 at 12-13].  Plaintiff also notes that in mid-2006, an IBM Employee Relations staff member named Kevin Sullivan

AO 72A
(Rev.8/8 2)

suggested that the company "line up someone like Drew Valentine" to try and convince Plaintiff to use the company's "open door" policies.  [Doc. 114 at 12-13, Tab 26]. Sullivan went on to state that he believed Valentine would be a good choice to work with Plaintiff because he is "a minority, an executive, and has experience working in diversity (plus, he is an attorney)."  [Id.].  Plaintiff's final piece of allegedly direct evidence of discrimination occurred when Chief Financial Officer Andrew "Vodopia offer[ed] Tasha Galloway an OIO Financial Analyst position in 2005, based solely on her race, Black."  [Doc. 114 at 13].

The evidence cited by Plaintiff does not even amount to circumstantial evidence of discriminatory treatment toward Plaintiff much less constitute direct evidence of discrimination.  First, simply because Burack and Wheaton discussed the fact that investigator Perry Rhue is black in no way implies discriminatory animus on their part. Common sense dictates that stating a person's race does not create an inference of discrimination on the part of the speaker.  Furthermore, because there is no evidence that these two Human Resources Partners were involved in any employment decision that had an adverse affect on Plaintiff, their comments, even if somehow construed as discriminatory, are not relevant to Plaintiff's claims.  "'For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made

43

by a person involved in the challenged decision.'" Bass v. Board of Comm'rs, Orange County, Florida, 256 F.3d 1095, 1105 (11th Cir. 2001) (quoting Trotter v. Board of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996)).  "'[R]emarks by non-decision-makers or remarks unrelated to the decision-making process itself are not direct evidence of discrimination.'" Id. (quoting Standard, 161 F.3d at 1330).

Next, the comments made by the Employee Relations staff member about the benefits of selecting Drew Valentine to work with Plaintiff because, among other things, he is a minority, are completely unrelated to a personnel decision involving Plaintiff.  Plaintiff has also failed to show that the staff member was involved in any way with a decision regarding Plaintiff's employment.  Bass, 256 F.3d at 1105. Finally, no reasonable jury would conclude that any racially discriminatory bias can be inferred from the fact that a company employee stated that it may be beneficial to have a black/minority employee investigate claims of discrimination made by another black employee.

With respect to the selection of Tasha Galloway, as noted *supra*, Plaintiff contends that Vodopia hired Galloway on the basis of her race, black.  [Doc. 114 at 13].  But Plaintiff has not offered a single piece of evidence supporting this assertion. Moreover, Plaintiff has failed to show that this hiring was related to any personnel

44

decision involving Plaintiff.  Galloway did not replace Plaintiff; in fact, they both worked as Financial Analysts together for approximately a year.  [Pla. Dep. at 491-92, 723, 736, 803-04; Vodopia Aff. ¶¶ 20, 21; DSMF ¶¶ 35-37].

For all these reasons, the court finds that Plaintiff is unable to offer evidence of "'blatant remarks, whose intent could be nothing other than to discriminate.'" Schoenfeld, 168 F.3d at 1266 (quoting Carter, 870 F.2d at 582).  Plaintiff, therefore, has failed to present any direct evidence of discrimination based on race or any other impermissible factor.  Plaintiff's circumstantial evidence, therefore, will be evaluated using the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973).

In a case like the present one involving circumstantial evidence, Plaintiff Harrison carries the burden of demonstrating that Defendant IBM has unlawfully discriminated against him.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The familiar McDonnell Douglas framework governs the allocation of burdens and order of presentation and proof, and they are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to the defendant to articulate some legitimate, non-discriminatory

45

reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was a pretext for discrimination.  See McDonnell Douglas, 411 U.S. at 802-04, 93 S. Ct. at 1824-25.

As noted *supra*, Plaintiff Harrison contends that Defendant IBM subjected him to discrimination based on race, sex and national origin when the company denied him three ASR positions, "blackballed" him with respect to "another Financial Analyst position," falsified his availability date in late 2006, and denied him the opportunity to transfer to another position.  [Doc. 114 at 39].  Plaintiff can establish a *prima facie* case of discrimination by proving: (1) that he was within a protected class; (2) that he suffered an adverse employment action; and (3) that a similarly situated employee outside his protected class was treated more favorably.  See Burdine, 450 U.S. at 258, 101 S. Ct. at 1096; Krieg v. Paul Revere Life Ins. Co., 718 F.2d 998, 999 (11th Cir.1983).  Plaintiff and the "comparator" employee must be similarly situated in all respects.  See, e.g., Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir.1989).

Plaintiff Harrison is able to establish the first *prima facie* element with regard to his race, sex and national origin discrimination claims because he is a black male who was born in Jamaica West Indies.  [PSMF ¶ 1].  Defendant IBM makes no

46

argument to the contrary.  [Doc. 99 at 26].  However, as to the second element, Defendant argues that none of the complained-of actions rise to the level of adversity necessary to invoke the protections of Title VII.  [Doc. 99 at 26-31; Doc. 125 at 4-7].

To be actionable, an alleged discriminatory action must be both subjectively and objectively adverse.  See Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000); Doe v. DeKalb County School District, 145 F.3d 1441 (11th Cir. 1998) (adopting an objective test to determine if an employment action is adverse). Moreover, the adversity must be material; that is, it must be more than "some de minimis inconvenience or alteration of responsibilities."  DeKalb County School District, 145 F.3d at 1453.  Accordingly, "[a]n action must 'show a serious and material change in the terms, conditions, or privileges of employment' for it to constitute an adverse employment action."  Ashmore v. J.P. Thayer Co., 303 F. Supp. 2d 1359, 1373 (M.D. Ga. 2004) (quoting Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001)).  As the Eleventh Circuit has pointed out, "'[N]ot everything that makes an employee unhappy is an actionable adverse action.'"  DeKalb County School District, 145 F.3d at 1449 (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).  Otherwise, "'every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination

47

suit.'" <u>Id.</u> (quoting <u>Williams v. Bristol-Myers Squibb Co.</u>, 85 F.3d 270, 274 (7th Cir. 1996)). <u>Accord</u> <u>Graham v. Fla. Dep't of Corrections</u>, 1 F. Supp. 2d 1445, 1449 (M.D. Fla. 1998) (holding that a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation") (citation omitted).

Plaintiff Harrison states that he was subjected to adverse employment actions when Defendant IBM denied him three ASR positions. In the summer of 2005, Harry Gornick, the hiring manager, made the decision to place the following individuals into the ASR positions: Norbert Cardenas (Hispanic, male), Nancy Reno (white, female), and Roberta Coughlin (white, female). [Gornick Aff. ¶¶ 5-9, Exs. B, C, D; Rhue Dep., Ex. 16; DSMF ¶¶ 24, 25; Gornick Dep. at 170, 176]. While Plaintiff is able to show that employees outside his protected classes were selected over him for the ASR positions, he cannot establish that he suffered an adverse employment action.

The ASR position was a "Band 7" job, the same job level as the Financial Analyst position held by Plaintiff. [Pla. Dep. at 457-58; DSMF ¶ 22]. And, as Plaintiff testified, the ASR job would have been a "lateral transfer" for him, with no increase

48

in pay.  [Pla. Dep. at 457-58].  Courts have held that the denial of a lateral job transfer is not a materially adverse action.  For example, in Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1031-33 (11th Cir. 2008), the Eleventh Circuit recently held that an employer's decision to deny a plaintiff's request for a lateral transfer did not amount to an adverse employment action.  Other courts have also held that a denial of a lateral transfer does not qualify as materially adverse.  See Barnhart v. Wal-Mart Stores, Inc., 206 Fed. Appx. 890, 893 (11th Cir. 2006) (holding that because a "lateral transfer that does not result in 'lesser pay, responsibilities, or prestige' is not adverse," in the same way, "the refusal to give an employee such a transfer cannot be an adverse employment action"); Barnes v. Crowne Investments, Inc., 391 F. Supp. 2d 1108, 1115 (S.D. Ala. 2005) ("The court notes that the denial of lateral transfers are generally not considered to be adverse employment actions."); Smith v. Alabama Dep't of Corrections, 145 F. Supp. 2d 1291, 1299 (M.D. Ala. 2001) ("While it logically may make sense to say that a denial of a transfer is an 'adverse' action because it is not what the employee wished, such an action is no more 'adverse,' logically speaking, than a purely lateral transfer made against an employee's will, which the Eleventh Circuit has stated in [DeKalb County School District, 145 F.3d 1441] does not necessarily rise to the level of an adverse employment action." ).  In the present case, Plaintiff Harrison

49

has not offered any evidence that being passed over for the ASR positions resulted in a serious and material change in the terms, conditions, and privileges of his employment.  Accordingly, Plaintiff is unable to establish this *prima facie* element.

Plaintiff Harrison next claims that he was "blackballed" with respect to "another Financial Analyst position."  [Doc. 114 at 39].  Plaintiff alleges that in August 2006, Jorge Colon expressed interest in hiring Plaintiff and asked Andrew Vodopia to send him Plaintiff's resume.  [Doc. 114 at 30].  According to Plaintiff, "Vodopia falsified information and requested that Plaintiff send Vodopia his resume for 'head Count Planning purposes.'"  [Id.].  Vodopia testified that he asked Plaintiff for his resume, but Plaintiff refused to provide it.  [Vodopia Dep. at 233].  As a result, Vodopia told Colon to contact Plaintiff directly for his resume.  [Id.; Vodopia Dep., Ex. 21].  In an August 2006 email, Vodopia informed Colon that Plaintiff "is very conscientious about his work but needs a lot of direction.  Don't expect a lot of analysis but if it's something that is routine and repeatable he is dependable."  [Vodopia Dep., Ex. 21; Doc. 114 at 30].

The court finds that Plaintiff is unable to show that this incident amounted to a serious and material adverse employment action.  There is no doubt that some of Vodopia's comments about Plaintiff's work were critical and unflattering, but the

AO 72A

(Rev.8/8
2)

Eleventh Circuit has found that "criticisms of an employee's job performance–written or oral–that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." <u>Davis</u>, 245 F.3d at 1241.  The reason behind this is clear:

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace.  Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance.  Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee.

<u>Id.</u> at 1242.  In <u>Akins v. Fulton County, Georgia</u>, 420 F.3d 1293, 1300-02 (11th Cir. 2005), the Eleventh Circuit held that various acts of verbal and written discipline, including reprimands, negative evaluations, exclusion from meetings, and threats of termination and suspension without pay, did not constitute adverse employment actions.

In the present case, the comments from Vodopia to Colon about Plaintiff's work performance did not result in a demotion or a suspension.  Moreover, Plaintiff did not suffer a loss in pay or benefits.  <u>See</u> <u>DeKalb County School District</u>, 145 F.3d at 1452; <u>Cargile v. Horton Homes</u>, 851 F. Supp. 1575, 1578 (M.D. Ga. 1994).  Even assuming

51

that Vodopia's comments prevented Plaintiff from getting a job offer from Colon, the job was for a Financial Analyst position, the same position that Plaintiff held.  As noted *supra*, being denied a lateral transfer does not constitute an adverse employment action.  Webb-Edwards, 525 F.3d at 1031-33; Barnes, 391 F. Supp. 2d at 1115.  For these reasons, the court finds that Plaintiff Harrison has failed to establish that he suffered an adverse action when he was allegedly "blackballed" by Vodopia with respect to another Financial Analyst position.  [Doc. 114 at 39].

Plaintiff Harrison next claims that he was subjected to an adverse employment action when Vodopia allegedly falsified Plaintiff's availability date in late 2006.  [Doc. 114 at 31, 39].  In October 2006, Vodopia instructed IBM's Coordinator for "Americas Finance Board Resource Meeting" to show Plaintiff's date of availability for a new position as being the fourth quarter of 2006.  [PSMF ¶ 49].  Records had previously stated that Plaintiff's availability date was the third quarter of 2006.  [Id.].  Plaintiff writes, "Vodopia and [Stephanie] Parke claimed that Plaintiff was available to leave since March 2005."  [Id.].  Plaintiff has offered no evidence that Vodopia "falsified" his availability date.  Vodopia gave his instruction to update Plaintiff's availability in October 2006, which was the fourth quarter of the year.  [PSMF ¶ 49; Doc. 114 at 31].  Moreover, Vodopia's instruction was to state that Plaintiff was immediately available,

52

i.e., in the fourth quarter.  [Id.].  Plaintiff has not established that this information was false.  In addition, while Plaintiff contends that he had been "available to leave since March 2005," he has failed to show that Vodopia's decision to list Plaintiff's availability date as being during the current quarter affected him negatively in any way. Because Plaintiff has not offered any evidence that the change in the availability date constituted "a serious and material change in the terms, conditions, or privileges of employment," the court finds that it did not rise to the level of an adverse employment action.  Davis, 245 F.3d at 1239.

Plaintiff Harrison's next claim is that he was subjected to discrimination when Defendant denied him the opportunity to transfer to another position. [Doc. 114 at 39]. On January 16, 2007, Vodopia and Parke held a formal performance review meeting with Plaintiff Harrison to go over the 2006 PBC.  Vodopia had been given a rating of 3, which was the "lowest contributor" rating.  During the meeting, Vodopia specifically described the reasons for giving Plaintiff this rating.  [Pla. Dep. II at 162-63, Ex. U; DSMF ¶ 58].  Pursuant to IBM's practices and policies, because Plaintiff was rated a 3 in two consecutive PBC's, he was informed that he was no longer eligible to transfer to another position within IBM.  [Pla. Dep. II at 192-93, 196, 199, 204, Exs. V, W; Ames Aff. ¶ 4; PSMF ¶ 73; DSMF ¶ 59].  Defendant correctly notes that while Plaintiff

AO 72A

(Rev.8/8 2)

contends that being denied eligibility for a transfer constitutes an adverse action, he has offered no evidence that he was seeking a transfer to a higher classified position. No promotion was involved, and as discussed *supra*, merely being denied a transfer to a lateral position is not a serious and material change to the terms of employment. Webb-Edwards, 525 F.3d at 1031-33; Barnes, 391 F. Supp. 2d at 1115.

Plaintiff Harrison alleges that Defendant IBM subjected him to discrimination based on race, sex and national origin when the company denied him three ASR positions, "blackballed" him with respect to "another Financial Analyst position," falsified his availability date in late 2006, and denied him the opportunity to transfer to another position. [Doc. 114 at 39]. For all the foregoing reasons, the court concludes that Plaintiff is unable to show that any of these actions were seriously and materially adverse. Plaintiff's failure to offer evidence establishing that he suffered an adverse employment action means that he cannot establish a *prima facie* case of discrimination. Accordingly, the court **RECOMMENDS** that Defendant IBM's summary judgment motion [Doc. 99] be **GRANTED** on Plaintiff Harrison's claims of race, sex and national origin discrimination. See Burdine, 450 U.S. at 258, 101 S. Ct. at 1096; Krieg, 718 F.2d at 999. The court turns next to Plaintiff's retaliation claims.

54

AO 72A

(Rev.8/8

2)

**B.   Retaliation Claims**

Plaintiff Harrison alleges that he was subjected to retaliation in violation of Title VII and 42 U.S.C. § 1981.  Title VII acts to shield employees from retaliation for certain protected practices.  Specifically, the statute provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  "Title VII's prohibition against discharge and adverse employment actions in retaliation for protected activity applies to claims brought under § 1981."  Carr v. Stillwaters Development Co., L.P., 83 F. Supp. 2d 1269, 1277 (M.D. Ala. 1999).  As was the case with regard to Plaintiff's discrimination claims, this court will "explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."  Standard, 161 F.3d at 1330.

The McDonnell Douglas framework applies to retaliation cases.  See Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997); Robinson v. AFA Service Corp., 870 F. Supp. 1077, 1083 (N.D. Ga. 1994).  The burden of production is initially on Plaintiff, who must establish a *prima facie* case of retaliation by a preponderance of the

55

evidence.  To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).  The plaintiff "'need not prove the underlying claim of discrimination which led to [his] protest,' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." Holifield, 115 F.3d at 1566 (citing Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989)).  Moreover, "[i]t is important to note that this circuit interprets the causation requirement broadly: 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"  Robinson, 870 F. Supp. at 1083 (citing EEOC v. Reichold Chems., Inc., 988 F.2d 1564, 1571 (11th Cir. 1993)); see also Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

With regard to the protected expression element, Plaintiff Harrison is able to show that he complained about discrimination on numerous occasions. In March 2005, Vodopia noted in an email that Plaintiff, in a meeting with Vodopia, "brought up that there were race related issues in his prior job and that management didn't address them

adequately." Vodopia then wrote, "He didn't want to elaborate and I didn't ask for further explanation." [Doc. 114, Pla. Tab 23, Ex. 2; Vodopia Aff. ¶ 14, Ex. F]. In June 2005, Plaintiff informed Perry Rhue, the Open Door investigator, that "he does not trust IBM's HR Internal Policies restating that it has an adverse affect on minorities and Blacks." [PSMF ¶ 41; Rhue Dep., Ex. 7]. Plaintiff Harrison also complained about discrimination in November of 2005, when he filed an EEOC charge of discrimination. Plaintiff checked the boxes for race, sex, and national origin discrimination and retaliation and in the narrative section, mentioned that he was not selected for an ASR position. [Doc. 114, Tab 30; Pla. Dep., Ex. 6; PSMF ¶ 51; DSMF ¶ 71]. Plaintiff engaged in more protected expression in April 2006, when he filed a second EEOC charge alleging that IBM retaliated against him for filing his first charge. [Doc. 114, Tab 32; Pla. Dep. at 710, Ex. 7; DSMF ¶ 73; PSMF ¶ 54]. And, on October 23, 2006, Plaintiff filed his first lawsuit against IBM, claiming race, sex, and national origin discrimination, and retaliation. [1:06-CV-2549, Doc. 1; PSMF ¶ 66]. Plaintiff has, thus,[8] clearly established the first element of a *prima facie* case of retaliation.

_____

[8]Other complaints were not statutorily protected expression. In March, April and May of 2005, Plaintiff complained about Vodopia to IBM's Human Resources department. However, he did not allege that Vodopia had engaged in discrimination at any of these times. [Pla. Dep. at 239-41, 340-41, 360-64, 375, 381-84, 389, 484; Burack Dep. at 21-26, Exs. 1, 2; Parke Dep. at 92-95; Parke Aff. ¶¶ 2, 3; DSMF ¶¶ 11,

AO 72A
(Rev.8/8
2)

The next *prima facie* element requires Plaintiff Harrison to show that he suffered an adverse employment action.  <u>Shannon v. Bellsouth Telecomm., Inc.</u>, 292 F.3d 712, 715-16 (11th Cir. 2002).  The Supreme Court has held that in a retaliation case, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Noting that "the significance of any given act of retaliation will often depend upon the particular circumstances," the Court in <u>Burlington Northern</u> gave the following examples of how the context of an employment action determines whether it rises to the level of being materially adverse:

15, 16; PSMF ¶¶ 34, 36; Vodopia Aff. ¶ 6, 15, Ex. B].  After the March complaint, Vodopia spoke with Plaintiff about his concerns.  As noted *supra*, Vodopia stated in an email that during their conversation, Plaintiff brought up "race related issues," but these concerned his prior job that had nothing to do with Vodopia. [Doc. 140, Pla. Tab 23, Ex. 2; Vodopia Aff. ¶ 14, Ex. F].  Plaintiff's complaints about Vodopia during the spring of 2005 involved allegations that Vodopia was insensitive to his workload, had not selected Plaintiff for desired positions, and was generally treating Plaintiff unfairly. These complaints do not constitute protected expression because "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII."  <u>Coutu v. Martin County Board of County Comm'r</u>s, 47 F.3d 1068, 1074 (11th Cir. 1995).

AO 72A

(Rev.8/8 2)

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

Burlington Northern, 548 U.S. at 69, 126 S. Ct. at 2415-16.  The Eleventh Circuit has held, "[I]f an employer's conduct negatively affects an employee's salary, title, position, or job duties, that conduct constitutes an adverse employment action."  Akins, 420 F.3d at 1300 (citing Stavropoulos v. Firestone, 361 F.3d 610, 620 (11th Cir. 2004), cert. denied, 544 U.S. 976, 125 S. Ct. 1850, 161 L. Ed. 2d 727 (2005)).

Plaintiff Harrison contends that he was subjected to retaliation when he was: given "work reassignments intended to set him up for failure"; denied "the benefit of transferring to another position within IBM"; given "unwarranted/undeserved poor performance evaluations"; and finally terminated from his employment in April 2007. [Doc. 114 at 46].  With regard to Plaintiff's complaints about his work assignments, the court notes that Plaintiff has not offered any evidence to support his conclusory allegation that he was ever given assignments "intended to set him up for failure." [Doc. 114 at 46].  Vodopia stated that he made assignment changes in accordance with

59

business needs and communicated his expectations to his team of Financial Analysts. [Vodopia Aff. ¶¶ 4, 5, Ex. A; Vodopia Dep., Ex. 14; DSMF ¶ 4]. Plaintiff, however, was resistant to any work outside of the BOA account and either complained about it to the point of having management reassign the work, or he simply refused to do it. [Pla. Dep. at 330, 333-36, 381-82, Ex. 10; Vodopia Aff. ¶¶ 4, 5, Ex. A; Vodopia Dep., Ex. 14; DSMF ¶ 4]. In April 2005, when Vodopia asked Plaintiff to provide an expected completion date for the BONY pricing model which had been assigned in the prior month, Plaintiff went to Vodopia's manager claiming that the request was "insensitive to workload demands." This resulted in the reassignment of this work to Schwebel. [Pla. Dep. at 333, 375, 382-83, Ex. 10; Vodopia Dep., Ex. 14; Vodopia Aff. ¶ 6, Ex. B; DSMF ¶ 5]. Vodopia stated that although Plaintiff Harrison accepted the BOA account as his responsibility, he insisted on picking and choosing the facets of his job that he wanted to do and ignored others, such as his failure to complete any pricing model updates beyond the BOA Invoicing Model. [Vodopia Aff. ¶¶ 8, 9].

Plaintiff complained on numerous occasions that Vodopia was insensitive to his workload. [Pla. Dep. at 375, 381-84, 389, 484; Parke Aff. ¶ 3; Vodopia Aff. ¶ 6, 15, Ex. B; DSMF ¶¶ 15, 16; PSMF ¶ 36]. In May 2005, Plaintiff complained about, among other things, his workload, and he made a request for an investigation. Shortly

AO 72A
(Rev.8/8
2)

thereafter, the matter was turned over to IBM's Corporate Appeals Department for an Open Door investigation.  [Pla. Dep. at 389, 393-94; Parke Dep. at 109-126; Parke Aff., Ex. B; DSMF ¶ 18; PSMF ¶¶ 37, 38].  Perry Rhue investigated Plaintiff's claims that Vodopia was micro managing him, had assigned him more work than Schwebel, and had treated him unprofessionally or unfairly.  [Pla. Dep. at 402-03, 462; Rhue Dep. at 219, Ex. 14; DSMF ¶ 20].  Rhue reviewed documentation and a time line of events provided by Plaintiff and concluded that he had not been treated unfairly.  [Id.].

The facts clearly establish that Plaintiff was not pleased with the work assignments he received from Vodopia, his supervisor.  However, Plaintiff's dislike of his assignments does nothing to support his claim that these assignments were made to set him up for failure or that they were seriously and materially adverse.  Courts have noted that finding assignments and job duties to be adverse actions "would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts."  Davis, 245 F.3d at 1244.  Courts are "reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm."  Id., (citing Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (holding that "changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if

61

unaccompanied by a decrease in salary or work hour changes")).  This is because "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. . . . [A]pplying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks."  Davis, 245 F.3d at 1244.  In the present case, Plaintiff has offered no evidence that the work assignments he received constituted adverse employment actions.  Plaintiff was given work assignments to perform while he held the job of a Financial Analyst, and there is no evidence that these assignments were materially adverse.

Plaintiff's next complaint is that he was subjected to retaliation when he was denied "the benefit of transferring to another position within IBM."  [Doc. 114 at 46].  Plaintiff was not selected for any of the three ASR positions open in the summer of 2005.  [Gornick Aff. ¶¶ 5-9, Exs. B, C, D; Rhue Dep., Ex. 16; DSMF ¶¶ 24, 25; Gornick Dep. at 170, 176].  Plaintiff also was not allowed to transfer to another Financial Analyst position in mid-2006.  [Doc. 114 at 30].  For the reasons discussed *supra*, the court finds that Plaintiff did not suffer any adverse employment action when he was denied these positions.  The Financial Analyst position was the same job that

AO 72A
(Rev.8/8
2)

Plaintiff held.  The ASR position was the same job level as Plaintiff's Financial

Analyst position, and it would have been a "lateral transfer" for him with no increase

in pay.  [Pla. Dep. at 457-58; DSMF ¶ 22].  As previously noted, being denied a lateral

transfer is not normally considered to be seriously and materially adverse.

Webb-Edwards, 525 F.3d at 1031-33; Barnes, 391 F. Supp. 2d at 1115.[9]  Because

Plaintiff has not offered evidence showing that being denied a transfer was an adverse

employment action, the court finds that these denials cannot support his claim for

retaliation.

Even assuming *arguendo* that being denied the ASR positions were adverse

employment actions, Plaintiff would not be able to establish a *prima facie* case of

retaliation because he could not demonstrate a causal link.  In order to demonstrate a

causal connection between the protected expression and the adverse employment

action, Plaintiff Harrison must establish that a decision maker was aware of the

protected expression.  See Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056,

---

[9]Nor does Plaintiff's evidence establish that the challenged actions, either the work assignments and duties or the denial of lateral transfers, were materially adverse in the context of a retaliation claim, that is, that the actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington North, 548 U.S. at 68, 126 S. Ct. at 2415.  The overwhelming weight of the evidence set forth *supra* demonstrates that these actions did not deter, nor even slow, Plaintiff's repeated and ongoing complaints of mistreatment.

AO 72A

(Rev.8/8
2)

1060-61 (11th Cir. 1999); <u>Clover v. Total Sys. Serv., Inc.</u>, 176 F.3d 1346, 1354 (11th Cir. 1999). Plaintiff complained to Vodopia and Rhue in March and June 2005, respectively, that IBM had not addressed "race related issues" in a prior position that Plaintiff held and that he believed IBM's policies have "an adverse affect on minorities and Blacks." [Doc. 114, Pla. Tab 23, Ex. 2; Vodopia Aff. ¶ 14, Ex. F; PSMF ¶ 41; Rhue Dep., Ex. 7]. However, there is no evidence that Harry Gornick, the manager who made the decision to place three other persons into the ASR positions in the Summer of 2005, was aware of Plaintiff's allegations of discrimination. [Gornick Dep. at 149, 154, 160, 169-76, Exs. 15, 16; Gornick Aff. ¶ 4-9, Exs. B-D; DSMF ¶ 23-25; Rhue Dep., Ex. 16; Rhue Dep. at 179-81]. This is fatal to Plaintiff's retaliation claim. "It is not enough to show that someone at the company knew of the protected activity: 'the plaintiff must show that the person taking the adverse action was aware of the protected expression.'" <u>Bartlett v. W.T. Harvey Lumber Co.</u>, 398 F. Supp. 2d 1311, 1319 (M.D. Ga. 2005) (quoting <u>Bass</u>, 256 F.3d at 1119). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." <u>Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000). Because Plaintiff cannot show that Gornick, the decision maker

64

with regard to the ASR positions, was aware of Plaintiff's complaints at the time he made the hiring decisions, Plaintiff is unable to establish a causal link.

Plaintiff's final allegation in support of his retaliation claim is that he was given "unwarranted/undeserved poor performance evaluations" and that in April 2007, he was ultimately terminated from his employment. [Doc. 114 at 46]. The court finds that Plaintiff's termination obviously qualifies as an adverse employment action. Therefore, he is able to establish this element of a *prima facie* case of retaliation. Because the poor performance evaluations eventually led to Plaintiff's termination, they will be examined by the court along with the termination decision.

The final *prima facie* element requires Plaintiff Harrison to establish that a causal connection exists between his protected expression and the adverse employment action, in this case, his low evaluations and ultimate termination. When analyzing the causal link element, the court is essentially looking to see if any inference of retaliation can be drawn from the circumstances surrounding the employer's action. See Morgan v. City of Jasper, 959 F.2d 1542, 1547 (11th Cir. 1992) ("To establish the causal connection between her protected activity and the adverse employment action, Morgan had to demonstrate that defendant was discriminatorily motivated, which she could do by circumstantial evidence.").

65

If an employer takes an adverse employment action against an employee shortly after becoming aware of the employee's protected expression, then the short amount of time between the two events, standing alone, may be enough to produce an inference of a causal connection.  See Balletti v. Sun-Sentinel Company, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995) (citing Balicao v. Univ. of Minnesota, 737 F.2d 747 (8th Cir. 1984)).  "The shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated." Balletti, 909 F. Supp. at 1549; see also Brungart, 231 F.3d at 799 ("[T]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."); Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) ("The charge was made May 19, 1995 and Farley was fired seven weeks later on July 10, 1995.  We find this time frame sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case."); Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986) ("The short period of time [one month] . . . between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation.").  Conversely, the longer the period between the protected activity and the adverse employment

66

action, the weaker the inference that the adverse action was motivated by retaliatory animus.  See, e.g., Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (absent additional evidence establishing a causal connection, the fact that the plaintiff was terminated on July 7, 2005, following complaints of discrimination between April 8 and 11, 2005, is insufficient); Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) (holding that "the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").  In Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001), the Supreme Court stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'"  The Eleventh Circuit has noted that the Supreme Court in Breeden, 532 U.S. at 273, 121 S. Ct. at 1511, "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection."  Higdon, 393 F.3d at 1220.

In this case, Plaintiff Harrison first complained to Vodopia in March 2005 and to Rhue in June 2005 that IBM had not addressed "race related issues" when Plaintiff held a prior position and that he believed IBM's policies have "an adverse affect on minorities and Blacks."  [Doc. 114, Pla. Tab 23, Ex. 2; Vodopia Aff. ¶ 14, Ex. F;

67

PSMF ¶ 41; Rhue Dep., Ex. 7]. Plaintiff also complained about discriminatory actions in November 2005 when he filed his first charge of discrimination. [Doc. 114, Tab 30; Pla. Dep., Ex. 6; PSMF ¶ 51; DSMF ¶ 71]. Plaintiff filed additional EEOC charges in April 2006 and January 2007, and he filed his first lawsuit on October 23, 2006. [Doc. 114, Tab 32; Pla. Dep. at 710, Ex. 7; Pla. Dep. II at 161-62, Ex. T; DSMF ¶¶ 73, 74; PSMF ¶¶ 54, 66; 1:06-CV-2549, Doc. 1].

The evidence reveals that the poor job performance ratings occurred within a relatively short time after some of Plaintiff's protected activities. In May 2006, a month after Plaintiff's second charge, he was given his 2005 review or PBC. Vodopia gave Plaintiff a rating of 3, which is classified as the "lowest contributor" rating. [Vodopia Aff. ¶ 26; Parke Dep. at 60-61; DSMF ¶ 48]. In January 2007, three months after Plaintiff filed his first lawsuit, Vodopia issued Plaintiff his 2006 PBC, which gave Plaintiff another "lowest contributor" rating of 3. [Pla. Dep. II at 162-63, Ex. U; DSMF ¶ 58]. Plaintiff was terminated from his employment with IBM in April 2007, less than three months after he filed his third EEOC charge. [Pla. Dep. II at 268, Exs. MM, NN; DSMF ¶ 69].

If no other evidence relevant to Plaintiff's retaliation claims had been introduced, then the temporal proximity of one to three months between Plaintiff's

AO 72A

(Rev.8/8 2)

various complaints and the subsequent adverse actions would be sufficiently close to establish a casual connection.  However, as Defendant IBM correctly notes, even close temporal proximity is not enough to survive summary judgment if there exists intervening conduct which breaks any inferred causal connection between protected expression and adverse actions.  [Doc. 99 at 46].  As this court has held, "[A]ny inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established."  Wu v. Southeast-Atlantic Beverage Corp., 321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004) (citing, e.g., Robinson, 870 F. Supp. at 1084 (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance); Booth v. Birmingham News Co., 704 F. Supp. 213, 215-16 (N.D. Ala.) (holding that a short span of time created no reasonable inference of retaliation where the record contained "intervening factors," i.e., other reasons for the adverse action arising after the protected activity), aff'd without opinion, 864 F.2d 793 (11th Cir.1988)).

In the present case, Defendant argues, and the court agrees, that Plaintiff's intervening conduct negates the inference of retaliation caused by the short temporal proximity between the protected expression and adverse employment actions.  On

69

April 12, 2005, Andrew Vodopia asked Plaintiff Harrison to provide an expected completion date for the BONY pricing model, which was assigned to him as early as March 3, 2005.  After Plaintiff complained about Vodopia's request, the project was reassigned to Maryn Schwebel, Lead OIO Financial Analyst.  [Pla. Dep. at 333, 375, 382-83, Ex. 10; Vodopia Dep., Ex. 14; Vodopia Aff. ¶ 6, Ex. B; DSMF ¶ 5].  In May 2005, Plaintiff Harrison was asked to develop ideas for improving the OIO's maintenance approval process, but Plaintiff simply voiced his belief that Vodopia's suggestion was not viable and would not improve the process.  [Vodopia Aff. ¶ 7, Ex. C; Pla. Dep. at 389, 935-41; DSMF ¶ 6].

Vodopia stated that although Plaintiff accepted the BOA account as his responsibility, he insisted on picking and choosing the facets of his job that he wanted to do and ignored others.  [Vodopia Aff. ¶¶ 8, 9].  For example, Plaintiff failed to complete any pricing model updates beyond the BOA Invoicing Model (one of two models which needed to be updated for the BOA account).  As a result, Plaintiff was unable to detect an inaccuracy in the models that led to IBM's client receiving inaccurate information in late 2005.  In his affidavit, Vodopia wrote, "The BOA Project Executive ('PE'), who uncovered the issue when the OIO sought to extend the BOA contract in late 2005, informed me of the problem."  [Vodopia Aff. ¶ 8].

AO 72A

(Rev.8/8

2)

Schwebel then had to step in and rectify the discrepancy that Plaintiff had not detected for almost a year. [Vodopia Dep. at 222-24, Exs. 16, 19; Vodopia Aff. ¶¶ 8, 9; Ficklen Dep. at 98-101; DSMF ¶ 7]. Similarly, when asked to complete reports on the progress of the BOA account, Plaintiff either did not do the reporting updates or provided incomplete reports to Vodopia. And, instead of providing assigned monthly or even quarterly reports, Plaintiff submitted only two reports during the entire year of 2005. [Pla. Dep. at 533, 535-38; Vodopia Aff. ¶ 10; DSMF ¶ 8].

Plaintiff Harrison went on leave in early November 2005 and returned from leave on March 27, 2006. [Vodopia Dep. at 388; Vodopia Aff. ¶¶ 11, 21; Pla. Dep. at 491-92, 736; DSMF ¶¶ 33, 36]. Within two days of returning from leave, Plaintiff was scheduled to be trained by Patricia Feeney, lead ASR. The training, however, ended abruptly in less than 10 minutes because, according to Feeney, Plaintiff called her and Schwebel "phonies" and went on another tirade that caused Feeney to leave the office "shaking." Plaintiff testified that he told them that he was "allergic to phoniness." [Pla. Dep. at 750, 762-63; Feeney Dep. at 195-96, 216, 219, 221, Ex. 11; Vodopia Dep. at 368-69, Ex. 30; Vodopia Aff. ¶ 23; Gornick Dep. at 188-89; DSMF ¶ 41].

In late June 2006, after reaching two large and complicated order letters that needed to be input, Plaintiff met with Director Stephanie Parke and Vodopia.

71

AO 72A

(Rev.8/8
2)

According to Vodopia, Plaintiff informed them that he did not think he would ever be able to understand the BONY model.  In response, Vodopia reassigned the BONY model to Ron Rueckert, who had been hired as an OIO Financial Analyst in April 2006 after Schwebel left.  [Vodopia Dep. at 383; Vodopia Aff. ¶ 25; DSMF ¶ 47].  In August 2006, Rueckert went into Plaintiff Harrison's office to listen in on a telephone conference.  According to Rueckert, he did this because he had misplaced the call in number.  Plaintiff testified that afterwards, he told Rueckert that he "had to question his motive for just walking in [Plaintiff's] office uninvited in the manner in which he did."  [Pla. Dep. at 876].  Plaintiff described his discussion with Rueckert in the following way:

> [H]e said, ["]oh, I thought I could just walk in your office.  In my previous job I used to do that and it was not a problem.["]  I said, ["]Ron, basically, this is the first time.  And given the situation with Andy, I question that. . . .  [C]ouldn't you have taken it in Andy's office?  Like you had to pass Andy's office to come to my office.  Why didn't you take it in Andy's office.["] . . . ["]Andy was on the phone,["] he said. . . .  But I said, ["]Ron, it's the same call and you always take it in Andy's office.["]  And at that point I told him . . . ["]Ron, I might have an accent, I might be Jamaican, right, but it does not equate to stupidity.  I don't believe anything you just told me there.["]  And I just said to him, ["]Ron, I'm just going to advise you to stay out of what you don't understand what's going on.["]

[Pla. Dep. at 876-77].

AO 72A

(Rev.8/8 2)

In September 2006, Vodopia and Parke met with Plaintiff in an interim review meeting to go over Plaintiff's performance because he received a 3 on his 2005 PBC. During the review, Vodopia explained to Plaintiff that his performance had not improved and that he needed to accept additional assignments to level his workload with the other Financial Analysts.  [Vodopia Aff. ¶¶ 28-29, Exs. M, N; DSMF ¶ 50]. Shortly after the meeting, Vodopia sent an email to Plaintiff summarizing what was discussed.  Vodopia noted that, although Plaintiff was assigned to "update the BoNY pricing model," Plaintiff informed Vodopia and Parke that he "would never be able to understand the complexity of the order letters to complete the model updates and asked to be assigned other tasks."  [Vodopia Aff. ¶¶ 28-29, Ex. M].  Vodopia also pointed out that Plaintiff had been "given other pricing models to update," but the "activity on those models has been too light to give any kind of feedback."  [Id.].  Vodopia stated, "I told you that you needed to have additional responsibilities added to your job." [Id.].  At Plaintiff's request during the Interim Review meeting, Vodopia agreed not to assign any additional work until October 2006, so that Plaintiff could get through the quarter close.  However, when Vodopia began to try to add assignments to Plaintiff's responsibility in October 2006, Plaintiff was resistant to the additions and

73

AO 72A

(Rev.8/8 2)

maintained his resistance through the day that his first lawsuit was filed.  [Vodopia Aff. ¶¶ 29-30, Exs. M, O; Parke Dep., Ex. 33; DSMF ¶ 51].

Three weeks later, on November 16, 2006, Harrison went on medical leave and did not return to work until January 2, 2007.   [Complaint ¶¶ 179-99; Amended Complaint ¶¶ 179-80, 181-86; Pla. Dep. II at 89; PSMF ¶ 71; DSMF ¶ 52].  On January 16, 2007, Vodopia and Parke held a formal performance review meeting with Plaintiff Harrison to go over his 2006 PBC.  Vodopia gave Plaintiff a rating of 3, which is a "lowest contributor" rating, and Vodopia described the reasons for this rating.  [Pla. Dep. II at 162-63, Ex. U; DSMF ¶ 58].  Specifically, regarding his performance in 2006, Plaintiff's PBC review explained that he: (1) was unable to complete updating the BONY, Kaiser, and UPMC models in the time frame expected by management; (2) was unable to reconcile any of his contracts; (3) did not keep desk procedures current and audit ready; (4) failed to complete the order letter log in a timely manner as it took him approximately 20 hours to complete while, according Vodopia, it normally takes only 6 hours per week; (5) struggled with ad hoc requests to pull information from models, in one case claiming that the information could not be obtained, although it was later pulled in less than 30 minutes; (6) did not manage his time well and reacted negatively to management assistance and suggestions for completing tasks more

74

effectively; (7) failed to use resources available to help him resolve any difficulties; and (8) was frequently uncooperative in handling his work relationships.  [Pla. Dep. II at 169-74, 185-87, Ex. U; DSMF ¶ 60].  Pursuant to IBM's practices and policies, because Plaintiff was rated a 3 in two consecutive PBC's, he was informed he had 30 days in which to improve his performance or he would be placed on a formal 30-day Performance Improvement Plan ("PIP").  [Pla. Dep. II at 192-93, 196, 199, 204, Exs. V, W; Ames Aff. ¶ 4; PSMF ¶ 73; DSMF ¶ 59].

In the 30-day period following the 2006 PBC meeting, Plaintiff Harrison: (1) failed to make any updates to the Verizon or DTCC accounts; (2) only updated one partial order letter for the UPMC account; and (3) did not complete the revenue and profit analysis on Verizon, DTCC, UPMC, or BONY.  [Pla. Dep. II, Exs. GG, HH; DSMF ¶ 64].  Accordingly, on February 26, 2007, Plaintiff was rated a "4" or unsatisfactory, and pursuant to IBM's polices, he was placed on a PIP and given 30 days within which to improve his performance.  [Pla. Dep. II at 199, 243-44, Exs. GG, HH; DSMF ¶ 65].  Pursuant to the PIP process, on March 1, March 8, and March 15, 2007, Plaintiff attended weekly meetings to assess the progress on his performance, but he refused to provide any updates on his work and replied to questions regarding the status of his assignments by only saying, "No comment."  [Pla. Dep. II at 250-51, 253,

75

256-57, 259, Ex. II; DSMF ¶ 66].  Approximately two weeks later, on April 2, 2007, Plaintiff's employment was terminated.  [Pla. Dep. II at 268, Ex. MM].

As discussed *supra*, Plaintiff's performance deficiencies were noted by Plaintiff's supervisors throughout the time period relevant to this lawsuit.  Plaintiff's work performance problems began in early 2005 and continued until his termination in April 2007.  Given the continued problems with Plaintiff's work, there is no evidence that his complaints of discrimination and retaliation were causally connected to any of the low performance reviews or to his termination.  The numerous incidents of Plaintiff's poor work performance constitute intervening factors, and as a result, the court finds that Plaintiff is unable to establish the causal connection *prima facie* element.  See Robinson, 870 F. Supp. at 1084. Summary judgment is, therefore, warranted on Plaintiff Harrison's retaliation claim.

Assuming *arguendo* that Plaintiff was able to establish a *prima facie* case of retaliation based on his low performance reviews and eventual termination, the burden of production would shift to Defendant to articulate some legitimate, nondiscriminatory reason for the action taken against Plaintiff.  See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).  To satisfy its burden of

76

production, "the defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. (quoting Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094).  "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. (quoting Burdine, 450 U.S. at 257, 101 S. Ct. at 1096). The defendant's burden in the rebuttal stage is "exceedingly light." Walker v. NationsBank of Florida, 53 F.3d 1548, 1556 (11th Cir. 1995); Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

Defendant IBM satisfied its burden of producing a legitimate, non-discriminatory reason for giving Plaintiff Harrison low performance reviews and ultimately terminating his employment.  Defendant notes that shortly after Plaintiff began working as an OIO Financial Analyst in early 2005, Plaintiff began complaining about assignments and requests for updates.  He often did not respond to requests made by his supervisor or he refused to do the work that was assigned to him.  As a result, work was reassigned to other employees such as Maryn Schwebel and Ron Rueckert. [Pla. Dep. at 333, 375, 382-83, Ex. 10; Vodopia Dep. at 383, Ex. 14; Vodopia Aff. ¶¶

AO 72A
(Rev.8/8
2)

6-9, 25, 29-30, Exs. B, M, O; DSMF ¶¶ 5, 47, 51; Parke Dep., Ex. 33].  In late 2005, Plaintiff failed to detect an inaccuracy in the BOA models, which led to IBM's client receiving inaccurate information.  Schwebel then had to rectify the discrepancy that Plaintiff had not detected for almost a year.  [Vodopia Dep. at 222-24, Exs. 16, 19; Vodopia Aff. ¶¶ 8, 9; Ficklen Dep. at 98-101; DSMF ¶ 7].  Plaintiff often failed to turn in requested progress reports, and he submitted only two reports during the entire year of 2005.  [Pla. Dep. at 533, 535-38; Vodopia Aff. ¶ 10; DSMF ¶ 8].

Plaintiff Harrison was involved in confrontations with employees Patricia Feeney, Schwebel, and Rueckert.  [Pla. Dep. at 750, 762-63, 876-77; Feeney Dep. at 195-96, 216, 219, 221, Ex. 11; Vodopia Dep. at 368-69, Ex. 30; Vodopia Aff. ¶ 23; Gornick Dep. at 188-89; DSMF ¶ 41].  Plaintiff failed to perform tasks such as reconciling his contracts and updating various models in the time frame expected by management. [Pla. Dep. II at 169-74, 185-87, Ex. U; DSMF ¶ 60].  Pursuant to the PIP process, Plaintiff attended weekly meetings in March 2007 to assess the progress on his performance, but he refused to provide updates and only replied by saying, "No comment," when asked about the status of his assignments.  [Pla. Dep. II at 250-51, 253, 256-57, 259, Ex. II; DSMF ¶ 66].  As a result of these and other performance deficiencies discussed *supra*, Defendant IBM gave Plaintiff Harrison low performance

78

ratings and eventually terminated his employment.  The court finds that Defendant has satisfied its "exceedingly light" burden of producing legitimate, non-discriminatory reasons for the adverse actions taken against Plaintiff.  Walker, 53 F.3d at 1556.

Once a defendant meets its burden of production, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'"  See Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 255 & n.10, 101 S. Ct. at 1094-95 & n.10).  The plaintiff then "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination."  Holifield, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825).  Plaintiff's proof of pretext merges with his "ultimate burden of showing that the defendant intentionally discriminated against the plaintiff."  Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993)).  The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'"  Combs, 106 F.3d

79

at 1538 (quoting <u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th Cir. 1994)).

Plaintiff Harrison seeks to establish pretext by showing that his work performance was not poor.  He also attempts to show that he was given "work reassignments intended to set him up for failure" and that many of the problems he experienced were not his fault, but the fault of the pricing models he was using.  [Doc. 114 at 4-9, 46].  Plaintiff's arguments are unpersuasive because his disagreement with his employer's opinion of his work performance is not relevant to a pretext inquiry.  "It is obviously not a violation of federal employment discrimination laws for an employer to err in assessing the performance of an employee.  Thus, establishing pretext is not merely demonstrating that the employer made a mistake, but that the employer did not give an honest account of its behavior." <u>Walker</u>, 53 F.3d at 1564 (J. Johnson, concurring).  In other words, the relevant issue is whether the employer actually believed that the employee's performance justified adverse action at the time the decision was made.

"Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the

80

AO 72A

(Rev.8/8 2)

[law] does not interfere.'" Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th

Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir.

1988)).  As long as the decision makers at Defendant IBM honestly believed that

Plaintiff had failed to perform his duties and that this belief led to low performance

ratings and eventually termination, even if the decision makers were mistaken in their

belief, pretext is not established.  See Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-

53 (11th Cir. 1987).  Plaintiff has offered no evidence that Vodopia or any of the other

IBM decision makers did not honestly believe that Plaintiff's work performance was

poor.  Vodopia informed Plaintiff numerous times for more than a year that his

performance was not up to par, and as noted *supra*, Vodopia provided explicit reasons

for giving Plaintiff low performance ratings which eventually led to his termination.

       The court also notes that Plaintiff has acknowledged that he did, in fact, behave

in a confrontational manner with other employees, and this was one of the legitimate,

non-discriminatory reasons offered by Defendant.  Plaintiff's PBC review for 2006

noted that Plaintiff was frequently uncooperative in handling his work relationships.

[Pla. Dep. II at 169-74, 185-87, Ex. U; DSMF ¶ 60].  In March 2006, Plaintiff was in

a training session with Patricia Feeney and Maryn Schwebel, but the training ended

abruptly because of a confrontation.  According to Feeney, Plaintiff called her and

Schwebel "phonies" and went on a tirade that caused Feeney to leave the office "shaking." Plaintiff acknowledged the incident and acknowledged that he told Feeney and Schwebel that he was "allergic to phoniness." [Pla. Dep. at 750, 762-63; Feeney Dep. at 195-96, 216, 219, 221, Ex. 11; Vodopia Dep. at 368-69, Ex. 30; Vodopia Aff. ¶ 23; Gornick Dep. at 188-89; DSMF ¶ 41]. In August 2006, after co-worker Ron Rueckert went into Plaintiff Harrison's office to listen in on a telephone conference, Plaintiff acknowledged that he told Rueckert that he "had to question his motive for just walking in [Plaintiff's] office uninvited in the manner in which he did." [Pla. Dep. at 876]. Plaintiff testified that after Rueckert explained his reasons for walking into Plaintiff's office, he told Rueckert, "Ron, I might have an accent, I might be Jamaican, right, but it does not equate to stupidity. I don't believe anything you just told me there." Plaintiff testified that he then said, "Ron, I'm just going to advise you to stay out of what you don't understand what's going on." [Pla. Dep. at 876-77].

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons. . . . Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it. . . ." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). In the present case, Plaintiff has not met Defendant's proffered reasons head on and rebutted them. In Crawford v. City

of Fairburn, Georgia, 482 F.3d 1305, 1309 (11th Cir. 2007), the Eleventh Circuit Court of Appeals held that "[b]y failing to rebut each of the legitimate, nondiscriminatory reasons of the [employer], [plaintiff] has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination." Id. at 1309.  In the present case, Plaintiff has failed to show that decision makers did not honestly believe that his work performance was poor.  Plaintiff has also acknowledged that he engaged in confrontational conduct toward other employees.  Given these facts, Plaintiff is unable to rebut each legitimate, non-discriminatory reason proffered by Defendant. Plaintiff has failed to offer evidence which would allow a reasonable jury to conclude that Defendant's proffered reasons for giving Plaintiff low performance reviews and ultimately terminating his employment were pretexts for retaliation.

As discussed *supra*, the court has concluded that Plaintiff is unable to establish a *prima facie* case of retaliation because he is unable to establish causal connection. However, even assuming *arguendo* that a *prima facie* case could be established, summary judgment would nevertheless be warranted because Defendant has offered legitimate, non-discriminatory reasons for the adverse employment actions taken against Plaintiff, and he is unable to establish that these reasons are pretexts for retaliation.  For these reasons, the undersigned **RECOMMENDS** that Defendant

83

AO 72A
(Rev.8/8
2)

IBM's summary judgment motion [Doc. 99] be **GRANTED** on Plaintiff Harrison's Title VII and 42 U.S.C. § 1981 retaliation claims.

## V.   Conclusion

For all the foregoing reasons and cited legal authority, the court **RECOMMENDS** that Defendant IBM's motion [1:06-CV-2549, Doc. 99; 1:07-CV-1220, Doc. 99] for summary judgment be **GRANTED** on all of Plaintiff Harrison's claims.

The Clerk is **DIRECTED** to terminate this reference.


**SO RECOMMENDED AND ORDERED**[10], this 31st day of October, 2008.



_JANET F. KING_
UNITED STATES MAGISTRATE JUDGE

---

[10]*Supra* at p. 4, Defendant IBM's motion [1:06-CV-2549, Doc. 122; 1:07-CV-1220, Doc. 149] to disregard portions of Plaintiff's response DENIED.

AO 72A

(Rev.8/8
2)